

1

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF VIRGINIA

# RICHMOND DIVISION

SAMIR ALMUDHAFER,

v.

Civil Action No. 3: 25cv1075

SPOTSYLVANIA COUNTY PUBLIC SCHOOLS;

COURTLAND HIGH SCHOOL;

CLIFTON CONWAY, in his individual capacity;

BRADLEY LAEL, in his individual capacity;

KAMIEL RICKS, in his individual capacity;

SAMUEL HENKEL, in his individual capacity;

EMILY KERNISKY, in her individual capacity;

AMY SAINZ, in her individual capacity;

CHRISTOPHER MICHAEL SALAZAR, in his individual capacity;

RUBEN NAVARRO, in his individual capacity;

NAYELLI MORENO, in her individual capacity;

WILLIAM JETT, in his individual capacity;

AREIA MINTON-SMITH, in her individual capacity;

ASTRID DENBO, in her individual capacity;

Defendants.

# TABLE OF CONTENTS

## SECTION 1: SPOTSYLVANIA COUNTY PUBLIC SCHOOLS, COURTLAND HIGH SCHOOL, AND ADMINISTRATIVE DEFENDANTS

(Spotsylvania County Public Schools; Courtland High School; Clifton Conway; Bradley Lael; Kamiel Ricks; Samuel Henkel; Emily Kernisky) pp. 4-24 ___

## SECTION 2: CHRISTOPHER MICHAEL SALAZAR

pp. 25-84 ___

## SECTION 3: WILLIAM JETT AND AREIA MINTON-SMITH

pp. 85-117 ___

## SECTION 4: NAYELLI MORENO

pp. 118-152 ___

## SECTION 5: ASTRID DENBO

pp. 153-167___

## SECTION 6: RUBEN NAVARRO

pp. 168-176.___

# SECTION 1: SCPS

# COMPLAINT AND JURY DEMAND

(42 U.S.C. § 1983; Title IX, 20 U.S.C. § 1681 et seq.; Title VI, 42 U.S.C. § 2000d et seq.;

Section 504, 29 U.S.C. § 794; ADA Title II, 42 U.S.C. § 12131 et seq.; Supplemental State

Claims, if pleaded)

Plaintiff Samir Almudhafer ("Plaintiff" or "Samir"),(pro se), alleges as follows:

---

# I. PRELIMINARY STATEMENT

1. Nature of the Action. This is a civil rights and disability discrimination action arising from the egregious failure of Spotsylvania County Public Schools and Courtland High School leadership to protect Plaintiff, then a minor student, from severe and pervasive harassment, bias-based threats, and threats of sexual violence, and from a hostile educational environment that escalated into an on-campus assault attempt. Despite actual knowledge, Defendants responded with minimization, delay, victim-burden shifting, and bureaucratic attendance enforcement, culminating in Plaintiff's forced transfer.

2. Plaintiff seeks compensatory damages, punitive damages (where permitted), declaratory relief, injunctive relief, and attorneys' fees/costs (where authorized), for violations of federal civil rights law and disability discrimination statutes, plus supplemental state-law tort claims if pleaded.

---

# II. PARTIES

3. Plaintiff. Samir Almudhafer is a Virginia resident. At all relevant times, Plaintiff was a minor student enrolled at Courtland High School in Spotsylvania County, Virginia. Plaintiff observes Muslim religious holidays and has diagnosed mental health conditions including ADHD, Major Depressive Disorder, PTSD, and anxiety, of which Defendants were aware.

4. Defendant School Board. The School Board of Spotsylvania County, Virginia (the "School Board" or "SCPS") is a local governmental entity operating public schools, including Courtland High School, and is a recipient of federal financial assistance. It may sue and be sued and is a "person" for purposes of 42 U.S.C. § 1983. Monell municipal liability applies to local entities for constitutional violations caused by policy/custom, including failures to train/supervise.

5. Defendant Conway. At all relevant times, Clifton Conway was Principal of Courtland High School, responsible for enforcing safety/anti-bullying policies and supervising staff. He is sued in his individual capacity (for damages) and official capacity (for prospective relief).

6. Defendant Lael. At all relevant times, Bradley Lael was an Assistant Principal at Courtland High School, responsible for discipline and student safety. Sued in individual and official capacities.

7. Defendant Ricks. At all relevant times, Kamiel Ricks was an Assistant Principal at Courtland High School, responsible for student conflicts and discipline. Sued in individual and official capacities.

8. Defendant Henkel. At all relevant times, Samuel Henkel was a School Counselor and Director of School Counseling at Courtland High School, responsible for student counseling, attendance interventions, and student wellbeing coordination. Sued in individual and official capacities.

9. Defendant Kernisky. At all relevant times, Emily Kernisky was Plaintiff's Dual Enrollment English instructor. Sued in individual and official capacities.

10. Student Defendants / Doe Defendants. Plaintiff identifies certain student harassers by name (William Jett; Areia Minton-Smith; Christopher Michael Salazar; Ruben Navarro; Nayelli Moreno; Astrid Denbo) and also alleges key perpetrators known as "Sasan" and "Jericho" (last names unknown) and others. Plaintiff reserves the right to amend upon identification of all Doe Defendants.

- Note: Federal privacy rules may require initials for minors. See Fed. R. Civ. P. 5.2. Plaintiff pleads these identities as currently known for preservation and notice.

# III. JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 (federal questions and civil rights), and supplemental jurisdiction under 28 U.S.C. § 1367 over any related state-law claims.

12. Venue is proper under 28 U.S.C. § 1391(b) because all relevant acts and omissions occurred in Spotsylvania County, Virginia, within this District and Division.

---

# IV. TIMELINESS, LIMITATIONS, AND INFANCY TOLLING

13. Plaintiff was a minor during the operative events (2023–2024). Under Virginia law, applicable limitations periods that borrow state personal injury limitations (including many federal civil rights claims) are tolled during infancy. Va. Code § 8.01-229(A)(1) tolls limitations while a plaintiff is under a disability such as infancy.

14. Virginia's personal injury limitations period is generally two years.

15. Plaintiff turned 18 on January 25, 2025. Therefore, to the extent a two-year personal injury limitations period applies (common for § 1983 and often borrowed for Title IX/Title VI/ADA/504 claims), the limitations clock would begin no earlier than Plaintiff's date of majority, making this action timely on its face if filed within two years thereafter, subject to accrual and any additional tolling doctrines.

---

# V. FACTUAL ALLEGATIONS

(Defendants SCPS; Courtland High School; Conway; Lael; Ricks; Henkel; Kernisky)

## A. Plaintiff's known vulnerabilities: disabilities and minority status

16. Plaintiff has documented ADHD and has required ongoing psychiatric care and therapy for Major Depressive Disorder, PTSD, and anxiety. These conditions affected attendance and coursework at times.

17. Defendants had actual knowledge of these conditions. Plaintiff's father, Athir Almudhafer, directly communicated with school officials about Plaintiff's "constant medical appointments" and psychiatric needs.

18. Defendant Kernisky dismissed Plaintiff's disability and religious observances as "excuses." In an email to Plaintiff's father, Kernisky wrote Plaintiff had "used a religious holiday, ADHD, and even a resolved conflict with another student as excuses for not having completed the work." (quote as provided).

19. Plaintiff is a racial/religious minority (Muslim holidays; Middle Eastern descent), making him a target for bias-based harassment and slurs. Plaintiff's father warned the school that Plaintiff's minority status was threatened "every day."

# B. Severe harassment and threats (including sexual violence threats)

20. During the 2023–2024 school year, Plaintiff became the target of ongoing harassment by peers, led by two students known as "Sasan" and "Jericho," plus associates.

21. The harassment was severe and pervasive: ethnic/religious slurs, intimidation, near-daily threats of violence, and threats connected to soccer tryouts and school settings.

22. The threats included extreme violence and sexual assault threats. Plaintiff alleges perpetrators said Plaintiff should be "decapitated, raped, and killed" for his orientation and ethnic origin, and made statements implying a sexually violent assault.

23. Plaintiff's mental health deteriorated: severe anxiety, panic, insomnia, worsened depression, and school avoidance.

24. Attendance collapsed. By Defendants' own acknowledgment (Henkel), Plaintiff had been fully present only "15 days" with over "20 days" absences/tardies/early sign-outs during January–March 2024 (as you stated).

## C. Defendants' knowledge and inadequate response

25. Plaintiff and his parents repeatedly alerted the school starting early 2024. Henkel acknowledged Plaintiff was "having problems with students" and proposed moving Plaintiff away from those students in first block classes, which Plaintiff declined.

26. Defendants declined meaningful protective measures and refused a virtual transition: after a February 29, 2024 meeting, Defendants stated "there is no plan in place at this time for him to transition to virtual school" and that his DE class did not need to be changed (quote as provided).

27. Defendant Ricks allegedly forced a "mediation" / peer meeting with an aggressor, prematurely treated as "resolved," while harassment continued.

28. Defendants did not meaningfully discipline perpetrators for months. Plaintiff alleges no effective corrective action prior to May 2024.

29. Defendant Kernisky minimized Plaintiff's safety fears, telling him words to the effect that the other students "aren't worried about [you]."

## D. Written notice: May 4–6, 2024 emails

30. On May 4, 2024, Plaintiff's father sent a detailed complaint describing slurs, obsession, and threats: students "consistently call Samir slurs, threaten that they would beat him up in soccer tryouts next year, and many other disgusting things. This is no longer kids being childish, these are sadistic people who want to harm my son." (quote as provided).

31. Plaintiff's father criticized Kernisky's "excuses" framing and described Plaintiff feeling unsafe and uncomfortable in her class. He requested schedule changes and accommodation regarding missed work.

32. On May 6, 2024, Kernisky forwarded the complaint to Conway and Henkel (as stated), placing the Principal and Counseling Director on written notice.

33. Defendants proposed another meeting. Plaintiff's father refused, stating it was "very unnecessary," that the dismissive statements were real, and warning he would "forward this to the county" absent action.

## E. Attendance enforcement amid safety crisis

34. While the safety crisis persisted, Defendants focused on attendance policy and threatened an "attendance plan/contract," despite knowledge that fear, anxiety, and medical appointments were driving absences.

## F. May 10, 2024 assault attempt and forced transfer

35. On May 10, 2024, a student from the bully group physically confronted Plaintiff and attempted an assault on campus; Plaintiff heard the aggressor might have been armed (as stated).

36. Plaintiff's father emailed that evening: "It only took something that actually happened for any of the administration to take action." He announced Plaintiff "now has to transfer

schools" due to the school's handling. (quotes as provided)

37. A transfer dispute followed: Defendants suggested Spotsylvania High; Plaintiff's family refused and insisted on Riverbend, citing concerns about racism and discrimination. Ultimately Riverbend transfer was granted in June 2024 after additional advocacy and supporting documentation (as stated).

## G. Damages

38. Plaintiff suffered severe emotional distress with physical manifestations (panic attacks, insomnia, somatic symptoms), educational disruption, ongoing trauma symptoms, and treatment needs.

---

# VI. LEGAL STANDARDS (OVERVIEW)

39. Title IX (student-on-student harassment). A funding recipient may be liable in damages where it is deliberately indifferent to known acts of harassment that are severe, pervasive, and objectively offensive, effectively denying equal access to education.

40. Title VI (race/national origin discrimination). Title VI prohibits race/national origin discrimination in federally funded programs and supports damages for intentional discrimination; multiple courts analyze deliberate indifference to known race-based harassment as actionable. (Fourth Circuit authority discussing these standards includes recent decisions addressing Title VI school harassment frameworks.)

41. Section 504 / ADA Title II (disability discrimination). Section 504 and ADA Title II prohibit disability discrimination and require reasonable accommodation; damages generally require intentional discrimination (often shown by deliberate indifference), and the Fourth Circuit has applied deliberate indifference analysis in school harassment contexts under § 504.

42. § 1983 Equal Protection / Municipal Liability. Individuals acting under color of law may be liable for constitutional violations; local entities are liable only when a policy/custom/failure-to-train causes the violation (no respondeat superior).

43. Supervisory liability (Fourth Circuit). Supervisors may be liable where they knew of a pervasive risk, responded with deliberate indifference/tacit authorization, and causally linked that inaction to the injury.

44. No general constitutional duty to protect from private violence, absent narrow exceptions; Plaintiff pleads any substantive due process theory in the alternative.

# VII. CAUSES OF ACTION

(Plaintiff incorporates all preceding paragraphs.)

## COUNT I

**TITLE IX – Hostile Educational Environment; Deliberate Indifference (20 U.S.C. § 1681)**

(Against Defendant School Board/SCPS only)

45. Plaintiff realleges the foregoing.

46. SCPS is a recipient of federal funds and subject to Title IX.

47. Plaintiff was subjected to sex-based harassment including threats of sexual violence (rape threats) and harassment tied to perceived sexual orientation/gender nonconformity, severe, pervasive, and objectively offensive, depriving Plaintiff of educational access.

48. Appropriate persons at SCPS had actual knowledge, including: Counselor Director Henkel, Assistant Principals, and Principal Conway (via detailed written complaint

forwarded May 6, 2024).

49. SCPS responded with measures that were clearly unreasonable in light of known circumstances: minimization, shifting burden onto Plaintiff, refusal to implement a safety plan or virtual alternative, and failure to discipline perpetrators until after physical escalation, culminating in Plaintiff's forced transfer.

50. Under Davis, such deliberate indifference supports damages where harassment effectively bars access to educational opportunities.

51. Plaintiff suffered damages as alleged.

WHEREFORE Plaintiff seeks relief as set forth below, including compensatory damages and fees where authorized.

---

# COUNT II

**TITLE VI – Race/National Origin Hostile Environment; Deliberate Indifference (42 U.S.C. § 2000d)**

(Against Defendant School Board/SCPS only)

52. Plaintiff realleges the foregoing.

53. Plaintiff was targeted with ethnic slurs and bias-based threats tied to Middle Eastern descent and perceived protected traits.

54. SCPS had actual knowledge through repeated reports and written parental complaints.

55. SCPS acted with deliberate indifference and/or intentional discrimination by failing to take reasonable corrective action.

56. Plaintiff suffered damages.

# COUNT III

**SECTION 504 – Disability Discrimination; Failure to Accommodate; Deliberate Indifference (29 U.S.C. § 794)**

(Against Defendant School Board/SCPS only)

57. Plaintiff realleges the foregoing.

58. Plaintiff is an individual with disabilities (ADHD, anxiety/PTSD/MDD) affecting major life activities, known to SCPS.

59. SCPS denied reasonable accommodations and responded with hostility/minimization, including treating disability-related needs and mental health crises as "excuses," refusing or delaying academic flexibility, and failing to implement supportive measures even as the disability-related crisis escalated.

60. SCPS was deliberately indifferent to Plaintiff's federally protected rights. The Fourth Circuit has recognized deliberate indifference frameworks for § 504 harassment claims in school settings.

61. Plaintiff suffered damages.

---

# COUNT IV

**ADA TITLE II – Disability Discrimination; Failure to Accommodate (42 U.S.C. § 12132)**

(Against Defendant School Board/SCPS only)

62. Plaintiff realleges the foregoing.

63. SCPS is a public entity under Title II.

64. For the same reasons as Count III, SCPS discriminated against Plaintiff by reason of disability and failed to reasonably accommodate known needs, causing exclusion/denial of benefits.

65. Plaintiff suffered damages and seeks appropriate relief.

---

# COUNT V

**42 U.S.C. § 1983 – Equal Protection: Discriminatory Deliberate Indifference to Harassment**

(Against Conway, Lael, Ricks, Henkel, Kernisky in individual capacities; and against SCPS under Monell in Count VII)

66. Plaintiff realleges the foregoing.

67. Plaintiff was targeted with bias-based harassment (ethnicity/national origin; religion; and sex-based components). Individual Defendants, acting under color of state law, had actual

knowledge and responded with deliberate indifference, treating Plaintiff's complaints as "excuses" and "resolved conflicts," refusing protective measures, and allowing escalation.

68. Such conduct denied Plaintiff equal protection of the laws.

69. Plaintiff suffered damages. Individual Defendants are not entitled to qualified immunity because the right to be free from intentional discrimination and discriminatory deliberate indifference in public schooling was clearly established.

---

# COUNT VI (PLED IN THE ALTERNATIVE)

**42 U.S.C. § 1983 – Substantive Due Process: State-Created Danger / Affirmative Acts Increasing Risk**

(Against Individual Defendants)

70. Plaintiff realleges the foregoing.

71. While the Constitution generally imposes no duty to protect against private violence, Plaintiff alleges in the alternative that Defendants took affirmative actions that increased Plaintiff's vulnerability, including forcing a face-to-face "mediation" with an aggressor

and refusing safety measures after specific threats, thereby increasing foreseeable risk.

72. Plaintiff pleads this count recognizing controlling limits on due process failure-to-protect liability and preserving the issue for adjudication.

---

# COUNT VII

**42 U.S.C. § 1983 – Monell Liability (Policy/Custom/Failure to Train and Supervise)**

(Against SCPS/School Board)

73. Plaintiff realleges the foregoing.

74. SCPS is liable only for constitutional violations caused by official policy/custom, including omissions reflecting deliberate indifference (e.g., failure to train staff on threat response, harassment reporting, disability accommodation, and bias-based bullying protocols; failure to enforce anti-bullying measures; and institutional practices shifting burden to victims).

75. SCPS's policies/customs were the moving force behind Plaintiff's injuries.

# VIII. PRAYER FOR RELIEF

Plaintiff requests judgment against Defendants and the following relief:

A. Compensatory damages in an amount to be determined at trial (Plaintiff's prior demand of $10,000,000 is incorporated as the claimed measure of harm).

B. Punitive damages against individual Defendants where permitted by law (not against SCPS under § 1983).

C. Declaratory relief that Defendants violated Plaintiff's federal rights.

D. Injunctive relief as appropriate (training, policy enforcement, threat assessment compliance, disability accommodation procedures).

E. Attorneys' fees and costs where authorized (including 42 U.S.C. § 1988 for § 1983 claims; statutory fees under ADA/§ 504/Title IX where applicable).

F. Pre- and post-judgment interest as allowed.

G. Such other relief as the Court deems just and proper.

# IX. JURY DEMAND

Plaintiff demands trial by jury on all issues so triable.

---

due to the recent occurrence of the events in question, Plaintiff will timely serve a written notice of claim on the Spotsylvania County Attorney (or other designated county official) within the statutory period of six months from the accrual of these causes of action, describing the nature of the claim and the time and place of injury, as required by § 15.2-209. This lawsuit is being filed with the understanding that all statutory notice requirements will be satisfied, or that Defendants already have actual knowledge of the claim sufficient to satisfy the notice requirement . Plaintiff expressly reserves the right to amend this Complaint to aver compliance with the notice-of-claim provision once notice has been served or to otherwise demonstrate such compliance. The inclusion of this notice paragraph is not intended as a waiver of any argument regarding substantial compliance or actual notice, but is done out of an abundance of caution to ensure adherence to Virginia law.

# SECTION 2: CHRISTOPHER MICHAEL SALAZAR

Samir Almudhafer

V.

Christopher Michael Salazar

Complaint

(Jury Trial Demanded)

Parties, Jurisdiction, and Venue

Plaintiff – Samir Almudhafer– is an individual who at all relevant times was a minor student residing in Spotsylvania County, Virginia. Plaintiff reached the age of majority on January 25, 2025.

Defendant – Christopher Michael Salazar – is an individual residing in Spotsylvania County, Virginia. At all relevant times, Defendant was a schoolmate of Plaintiff in Spotsylvania County public schools.

Part I – State Law Jurisdiction: This Court has subject-matter jurisdiction over the state-law tort claims herein pursuant to Va. Code § 8.01-328.1, as Defendant resides in Virginia and the wrongful acts were committed in Virginia. Venue is proper in this Circuit under Va. Code § 8.01-262(1) as the causes of action arose in Spotsylvania County.

Part II – Federal Question Jurisdiction: This Court has original jurisdiction over the federal civil rights claims under 28 U.S.C. § 1331 (federal question) and § 1343(a) (civil rights), as those claims arise under 42 U.S.C. §§ 1981, 1983, 1985, and Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d et seq.). Venue is proper in the Eastern District of Virginia (Richmond Division) pursuant to 28 U.S.C. § 1391(b) because the events occurred in this District (Spotsylvania County is within the Richmond Division ).

Common Factual Background

A. Overview of Defendant's Pattern of Harassment (2019–2025)

5. From May 2019 through 2025, Defendant Christopher Salazar engaged in a continuous, targeted campaign of harassment, defamation, and intimidation against Plaintiff, motivated by animosity toward Plaintiff's sexual orientation and national origin. This wrongful conduct began when Plaintiff and Defendant were in the 6th grade (around May 2019) and persisted throughout middle school and high school, causing severe and mounting harm to Plaintiff's reputation, emotional well-being, and safety.

6. Homophobic Slurs and Rumors: On numerous occasions starting in 2019, Defendant loudly referred to Plaintiff with homophobic slurs such as "faggot," "maricón," and other derogatory epithets in front of other students. Defendant repeatedly spread false rumors that Plaintiff was homosexual (at a time when Plaintiff had not come out) in a manner calculated to subject Plaintiff to ridicule and hatred. In the context of Plaintiff's school and community, Defendant's branding of Plaintiff as "gay" was intended and understood as an insult and attack on Plaintiff's character. Defendant's statements were false or, at minimum, conveyed false implications – specifically, that Plaintiff's sexual orientation was something shameful or deviant. These statements harmed Plaintiff by holding him up to contempt and by inciting other students to bully and shun him. The law of defamation in Virginia recognizes that an individual's "right to personal security includes his uninterrupted entitlement to enjoyment of his reputation" , and Defendant's anti-gay slurs were calculated to destroy that reputation.

7. National Origin-Based Harassment: Defendant also targeted Plaintiff's ancestry and national origin. Plaintiff is of [Plaintiff's ethnicity/national origin], a fact known to Defendant. On multiple occasions, Defendant made derogatory comments about Plaintiff's background – for example, telling Plaintiff to "go back to [Plaintiff's country]" and referring to Plaintiff by ethnic slurs. Defendant falsely insinuated that Plaintiff was not an American and even suggested to

peers that Plaintiff's family was "in the country illegally," despite no basis for such claims. These statements were malicious falsehoods about Plaintiff's legal status and ethnic heritage, made to foment xenophobic hostility. Such ethnic taunts and lies exposed Plaintiff to public contempt and harmed his standing among his peers.

8. Group Harassment and Incitement: From the outset and increasingly over time, Defendant enlisted and incited other students to participate in the harassment of Plaintiff. Defendant's targeting of Plaintiff became a group campaign involving several of Defendant's friends and associates, including Ruben Navarro, Nayelli Moreno, Genesis Garcia, and others. Defendant encouraged and orchestrated these individuals to amplify the spread of rumors and to jointly bully Plaintiff. For example, Defendant would initiate group conversations (both in person and via group chats on social media) to discuss Plaintiff in derogatory terms, then prompt others to contribute additional insults or false allegations. In one such group chat from around 2023, Defendant and others exchanged messages mocking Plaintiff's perceived sexuality and skills, saying things like "he sucks at soccer" and using homophobic slurs, while Defendant egged them on. By acting in concert in this manner, Defendant created a mob of harassment focused on Plaintiff. Defendant's role as ringleader is evidenced by him directing comments and coordinating responses among the group. He often spurred others to "keep it going" whenever Plaintiff showed distress, thereby inciting continued group defamation and intimidation.

9. Escalation to Sexual Rumors and False Crime Allegations: In or around 2021–2022, as the students entered high school, Defendant escalated his defamatory campaign by concocting and disseminating blatantly false sexual rumors about Plaintiff. Most egregiously, Defendant falsely accused Plaintiff of committing sexual assault. On at least one occasion, Defendant told other students that Plaintiff had "tried to rape" a younger student – a horrendous fabrication with no

basis in reality. This lie spread quickly through whispered gossip at school, fueled by Defendant's repetition and encouragement. The accusation that Plaintiff perpetrated a rape – a serious felony crime – is defamation per se under Virginia law, as it is a false statement accusing Plaintiff of a heinous crime . Defendant made this accusation with actual malice, knowing it was false (or with reckless disregard for the truth) for the purpose of utterly destroying Plaintiff's reputation. As a direct result, Plaintiff was shunned, humiliated, and regarded with fear by some peers who heard the false allegation. Plaintiff, who was a minor of exemplary behavior, had never been involved in any such misconduct. Defendant's fabricated rape allegation exemplifies the depths of malice in his campaign.

10. Multiple School Years of Abuse: Defendant's tortious conduct continued in each school year, taking new forms as opportunities arose. By way of further illustration (without limitation):

Seventh Grade (2019–2020): After initiating the first rumors in 6th grade, Defendant in 7th grade revived and magnified them. For example, Defendant misrepresented an incident involving a "breadstick" (a nonsensical inside joke) to suggest Plaintiff had engaged in some humiliating sexual act. When confronted about spreading this false story in 2022, Defendant taunted Plaintiff, asking "why didn't you say the truth in seventh grade... you're just now saying it," and dismissing Plaintiff's denials. This shows that Defendant was aware the rumor was false but chose to perpetuate it and then ridicule Plaintiff's attempts to correct it.

High School (2020–2023): Defendant continued to target Plaintiff with insults about Plaintiff's masculinity and origin. During this year, Defendant began involving Ruben Navarro, a mutual classmate, by telling Ruben derogatory things about Plaintiff. In one instance, Plaintiff

discovered that Ruben, likely influenced by Defendant, was mocking Plaintiff's athletic ability (stating "he sucks at soccer"). Plaintiff incredulously asked, "how does Ruben know I suck at soccer, did he watch me?". This reflects Defendant's role in planting negative ideas about Plaintiff among peers. Defendant also ensured that Nayelli Moreno and Isaiah T., among others, joined the ridicule – e.g., making jokes about Plaintiff in group conversations and on social media, often laced with homophobic undertones.

Ninth & Tenth Grade (2021–2023): As Plaintiff entered high school, Defendant's harassment became more frequent and public. He would shout slurs at Plaintiff in hallways and disseminate insults online. In or around 2022, Defendant orchestrated a cruel prank wherein a fake social media profile was created to impersonate a romantic interest in Plaintiff, only to "out" and embarrass him later; upon information and belief, Defendant was behind or closely involved in this scheme. During 10th grade, Defendant started a rumor that Plaintiff had a sexually transmitted disease – another patently false statement aimed at ruining Plaintiff's reputation for purity and health. This rumor painted Plaintiff as promiscuous and unclean, adding a layer of defamatory stigma (falsely imputing a "loathsome disease," which is recognized as defamation per se ).

Tenth-Eleventh Grade (2022–2024): By junior year, Plaintiff's social isolation was severe. Defendant's long-running campaign meant that many classmates avoided or bullied Plaintiff. Defendant took credit for this isolation in messages to others, bragging that "no one will side with [Plaintiff] after what we said about him." Defendant also began involving younger students in the harassment – essentially "poisoning the well" for students who did not even know Plaintiff except through Defendant's slanders. For example, Defendant told incoming freshmen that Plaintiff was a "predator" to deter them from speaking to Plaintiff. Additionally, Defendant and his group (Navarro, Moreno, Garcia, and others) coordinated moments in class or soccer practice to publicly snicker or stage whisper insults at Plaintiff, causing him extreme embarrassment. On one occasion in late 2022, Defendant sent a messgae to Bridget Bahena about Plaintiff containing only the word "FAGGOT" in capital letters, which other students saw, leading to chuckles at Plaintiff's expense. Plaintiff's complaints to a teacher about this incident went largely unheeded.

Twelfth Grade (2024–2025): In Plaintiff's senior year, Defendant's harassment reached its zenith and most tragic consequences. Defendant circulated the aforementioned false rape allegation during the fall of 2024, a lie that caused tremendous damage. Students whispered and speculated about Plaintiff being "a rapist," and one student's parent even contacted the school with concern, triggering school administrators to inquire into the situation. In addition, Defendant around this time repeatedly used ethnic slurs against Plaintiff in person – for instance, sneering "[Plaintiff] is a little border-jumper" in the hallway, implying Plaintiff was an illegal immigrant. These comments, heard by other students, were intended to and did incite additional harassment from

those who harbored prejudice. Throughout senior year, Defendant and his conspirators maintained a hostile environment for Plaintiff, who dreaded coming to school each day.

School Authorities' Knowledge: School administrators and staff were aware, or should have been aware, of the ongoing harassment of Plaintiff. Plaintiff and others made multiple reports or complaints to teachers and counselors about Defendant's conduct between 2019 and 2025. For example, after Defendant spread the false sexual assault rumor in 2024, a concerned teacher reported the matter to the school principal. Despite this knowledge, the school's response was ineffectual – no significant discipline of Defendant occurred, and the harassment persisted. On information and belief, the school's administrators at times attempted mild interventions (such as having a counselor talk to Defendant), but these efforts were insufficient and often not followed up. Defendant thus perceived, correctly, that he could continue his campaign with impunity. The indifference of those in authority effectively condoned and enabled Defendant's conduct. By allowing a climate of unchecked harassment, school officials facilitated a deprivation of Plaintiff's rights to equal protection and dignity in the educational environment. Though no school personnel are named as defendants in this Complaint, their inaction provides context: Defendant's actions were carried out under the color and acquiescence of state authority, i.e. within a public school setting that failed to safeguard Plaintiff's rights. Defendant leveraged this environment to magnify the impact of his abuse.

Plaintiff's Parents Learn of Plaintiff's Sexual Orientation through Defendant's Orchestration: In 2019, as a result of the turmoil caused by Defendant's rumors, Plaintiff's deeply personal information was involuntarily exposed to his family. Up to that point, Plaintiff had not come out as gay to his parents, fearing their reaction. However, in or about December 2022, following the school's inquiry into the rape rumor and related harassment, school officials contacted Plaintiff's parents. During a meeting in which the false allegations were discussed, it became apparent that the harassment centered on Plaintiff's perceived sexuality. In this manner, Plaintiff's parents learned that Plaintiff is gay. This revelation was a direct and foreseeable result of Defendant's misconduct – he created a crisis that forced the disclosure of Plaintiff's sexuality.

Parents' Violent Reaction and Plaintiff's Resulting Suicide Attempt: Plaintiff's parents reacted to the news of Plaintiff's sexual orientation with extreme hostility and violence. Coming from a cultural and personal background that stigmatizes homosexuality, Plaintiff's father in particular became enraged. On the evening of the revelation, Plaintiff's father physically assaulted Plaintiff, yelling slurs and denouncing him. Plaintiff's mother, while not physical, also verbally abused Plaintiff, calling him disgrace and other demeaning terms. Plaintiff was told he had "brought shame" to the family because of the rumors and his orientation. The situation at home became dire: Plaintiff, a teenager, was effectively unsafe in his own household solely because Defendant's malicious gossip outed him in the worst possible way. Overwhelmed by despair, humiliation, and a feeling of betrayal, Plaintiff attempted to take his own life shortly after this

incident. In mid-2019, Plaintiff attempted suicide by . He was found and rushed to the hospital, where he was admitted for emergency medical and psychiatric care. Plaintiff remained hospitalized and recovering from physical harm and acute psychological trauma. This catastrophic outcome – a teenager's suicide attempt – was the culmination of years of torment set in motion by Defendant. It is a testament to the severe emotional distress inflicted upon Plaintiff. Indeed, as the Virginia Supreme Court has observed, society has a strong interest in redressing attacks upon an individual's reputation and emotional well-being . Here, Defendant's outrageous conduct led not only to reputational harm but to life-threatening injury.

Aftermath – Further Defamation and Malice: Remarkably, Defendant did not relent even after Plaintiff's hospitalization. Upon Plaintiff's partial return to school in early 2025 (during recovery), Defendant continued to circulate derogatory gossip. He told other students that Plaintiff "went crazy" and implied that Plaintiff's suicide attempt was merely an act to gain attention, stating falsely that "he's just doing it for pity." These statements compounded the defamation by portraying Plaintiff as unstable and manipulative. Additionally, when classmates learned of the abuse at home Plaintiff suffered, Defendant cynically told them that Plaintiff "deserved" what he got and suggested that Plaintiff had lied to his parents about the situation – again casting Plaintiff as untruthful. Such comments show Defendant's unflagging malice and intent to ruin Plaintiff's standing in the community.

Legal Preservation Notice and Defendant's Reaction: On December 27, 2025, undersigned counsel (on Plaintiff's behalf) served Defendant with a formal Litigation Hold and Preservation Notice. This notice detailed Plaintiff's potential claims and instructed Defendant to preserve all evidence, and to cease any defamatory publication henceforth. Defendant received this correspondence (via certified mail and email). Instead of showing any contrition, Defendant reacted with open defiance. Within hours of receiving the notice, on or about December 28, 2025, Defendant made additional defamatory remarks about Plaintiff in a group chat and to mutual acquaintances. Specifically, Defendant wrote in an online chat (with several of the above-named peers) words to the effect of slurs, threats, etc. Defendant also stated to at least one person that Plaintiff was suing "for no reason except to get back at us for what actually did what we said." These statements, made after Defendant was on notice to preserve evidence and refrain from defamation, demonstrate a willful continuation of the very conduct at issue. The post-notice statements were false (reiterating that Plaintiff is a liar who "did" the misconduct alleged) and showed conscious disregard of Plaintiff's rights. They willfully exacerbated Plaintiff's damages and confirm Defendant's actual malice.

B. Tolling of Statute of Limitations (Infancy)

16. Tolling Due to Minority: Plaintiff was under eighteen (18) years old for the vast majority of the period during which Defendant's wrongful acts occurred (2019 through January 25, 2025).

Accordingly, pursuant to Virginia Code § 8.01-229(A)(1), any applicable statutes of limitation for Plaintiff's state-law causes of action were tolled during Plaintiff's period of minority . Plaintiff turned 18 on January 25, 2025, which removed the disability of infancy on that date. Under Virginia's tolling rule, Plaintiff then had the full statutory limitations period (e.g., one year for defamation , two years for personal injury, etc.) from that date to timely file suit. This Complaint, filed on December 29, 2025, is within one year of Plaintiff's 18th birthday and is therefore timely as to all state-law claims. The defamatory publications and injuries that occurred while Plaintiff was a minor are not time-barred because the clock did not run during minority . Furthermore, to the extent any defamatory statement was published within one year prior to filing, it is independently within the limitations period . Plaintiff pleads the benefit of all tolling provisions and exceptions to any statute of limitations, given the infancy tolling and the continuous nature of Defendant's wrongdoing.

PART I — STATE TORT CLAIMS (Virginia Circuit Court Jurisdiction)

Plaintiff incorporates by reference all foregoing paragraphs (1–16) as if fully set forth in each Count below. All of the following causes of action arise under Virginia common law or statute. Plaintiff alleges that Defendant Salazar is liable under each Count for the damages proximately caused by the acts and omissions described.

Count I – Defamation (Libel and Slander per se)

(False and Defamatory Statements Injuring Reputation)

Publication of False Statements: Defendant made numerous false, defamatory statements of fact about Plaintiff to third parties (including classmates, other students, and community members).

These statements were published orally (slander) and in writing via text messages, social media posts, and notes (libel). Particular false statements include, but are not limited to: (a) that Plaintiff committed a sexual assault (rape); (b) that Plaintiff has a serious sexually transmitted disease; (c) that Plaintiff is untrustworthy or dishonest (a "liar"); (d) that Plaintiff's sexual orientation is homosexual, conveyed as a negative assertion and false implication that Plaintiff engaged in immoral sexual behavior; and (e) that Plaintiff is an "illegal" immigrant or otherwise of dubious national origin status. These statements were communicated to numerous third persons without privilege – for example, Defendant told multiple fellow students in conversation that "Plaintiff raped someone," and posted messages in group chats stating "Plaintiff is a fag and an illegal" (or substantially similar wording), among other defamatory pronouncements. Each of these statements was false. Plaintiff has never committed any crime, let alone rape; Plaintiff does not have any venereal or contagious disease; Plaintiff is not "illegal" and in fact is a U.S. citizen/national; and while Plaintiff's sexual orientation is a personal matter (and not shameful), Defendant's publications about it were fraught with false implications (suggesting deviance and deceit) that are untrue.

Defamatory Meaning: Defendant's statements, in their plain meaning and by clear implication, are defamatory. They harmed Plaintiff's reputation and exposed him to public contempt, ridicule, and scorn. A reasonable person would understand the statements to convey extremely negative assertions about Plaintiff's character and conduct. In particular, accusing someone of rape or serious sexual misconduct is defamatory per se, as it imputes the commission of a heinous crime

. Likewise, falsely stating someone has a loathsome disease (e.g., an STD) is traditionally defamatory per se . Even statements that may not fall into per se categories – such as calling Plaintiff a "liar," attacking his sexuality, or national origin – are defamatory in context because they "tend to harm one's reputation" and would cause reasonable listeners to think less of Plaintiff . Indeed, the "defamatory sting" of Defendant's statements is obvious: they brand Plaintiff as a criminal, a person of low moral character, and an object of disgust. Defendant intended this sting and knew that substantial danger to Plaintiff's reputation was apparent from his words . To the extent any of Defendant's false statements might not appear obviously defamatory to a casual publisher, Defendant acted with New York Times malice (as detailed below), and under Virginia law even a private individual plaintiff must prove malice in such a scenario – a standard that Plaintiff's allegations comfortably satisfy.

Falsity: All defamatory statements alleged herein are false. Plaintiff never engaged in the misconduct Defendant described. For instance, no rape or sexual assault ever occurred. Defendant wholly fabricated that claim. Likewise, Plaintiff does not carry any communicable disease that would ostracize him (Defendant's rumors to the contrary were made up). Plaintiff's national origin or immigration status was falsely disparaged – he is law-abiding and his family's presence is lawful. Any assertion that Plaintiff lied about Defendant or anything else is also false – to the contrary, Plaintiff's claims now are truthful, and Defendant's accusations were lies. Truth is a complete defense to defamation, but here Defendant cannot prove the truth of his statements (because they are lies). Thus, no privilege or defense shields Defendant. Plaintiff affirmatively

pleads that Defendant's statements lack any "substantial truth" that could justify them . Any minor kernel of truth (e.g., that Plaintiff is gay) does not match the "defamatory sting" with which Defendant imbued his statements . In context, Defendant's publications were laden with false implications of criminality and moral turpitude that render them actionable despite any arguably true detail.

Fault (Actual Malice and Negligence): Defendant made the defamatory statements with the highest degree of fault. Actual malice is abundantly present: Defendant knew his accusations were false, or at minimum recklessly disregarded obvious facts showing falsity. For example, Defendant knew Plaintiff had never raped anyone -- no such incident was ever reported except through Defendant's own fiction -- yet he spread the rape lie intentionally to destroy Plaintiff's life. Defendant also had no reason to believe Plaintiff carried a disease or was "illegal"; those were baseless insults, not mistakes. Moreover, Defendant repeated and embellished his claims over time even after opportunities to learn the truth (such as when Plaintiff and others denied the rumors). His persistence in the face of contrary information demonstrates reckless disregard for truth. Because Plaintiff is a private individual and the defamatory statements did not concern any matter of public concern beyond Plaintiff's private life, the minimum fault standard required is negligence -- a standard far exceeded here. Defendant's conduct was willful and wanton. Even under the stricter standard of actual malice (knowledge or reckless disregard of falsity), Defendant's liability is established by his deliberate lies and sustained campaign of defamation.

Injury and Per Se Liability: As a direct and proximate result of Defendant's defamation, Plaintiff has suffered significant injury, including but not limited to: damage to his personal reputation in the community and among his peers; extreme mental anguish, humiliation, and emotional distress (evidenced by depression, trauma, and a suicide attempt requiring hospitalization); loss of educational opportunities (Plaintiff's ability to attend school and participate in normal activities was severely impaired by the hostile environment and damage to his good name); and other economic and non-economic damages (such as counseling/therapy expenses and impaired earning capacity stemming from trauma). Because Defendant's statements constitute defamation per se – e.g., false imputation of a serious crime – Plaintiff is entitled to a presumption of general damages without specific proof of monetary loss . Nonetheless, the harm here is concrete and has been devastating to Plaintiff's life. Plaintiff's standing and esteem among classmates was destroyed; he lost friendships and was ostracized. His family relationships were gravely harmed as described (an injury flowing directly from the defamation reaching his parents). Under Virginia law, "Society has a strong interest in preventing and redressing attacks upon reputation" , and Plaintiff seeks full redress here.

Aggravation by Post-Notice Publication: Defendant's defamatory statements made after December 27, 2025 (after receiving a legal preservation notice) are particularly egregious. They show that Defendant, far from retracting his lies, doubled down on them with express malice and ill will. These recent publications have continued to damage Plaintiff (who now as a young adult

is attempting to move on, only to have Defendant still smearing him). Such conduct will be relevant to punitive damages and demonstrates that injunctive relief may be necessary to prevent further irreparable harm.

No Privilege: Defendant's statements were not subject to any privilege. They were not made in any judicial, legislative, or other protected proceeding, nor in any context that would qualify as privileged communications. Even if any privilege could be hypothesized, Defendant forfeited it by acting with malice. There is no applicable qualified privilege for malicious gossip in a school setting; and certainly the outright fabrications (like the rape allegation) enjoy no protection.

Punitive Damages: Given Defendant's intentional, malicious conduct, Plaintiff seeks punitive damages for defamation. Defendant's actions were undertaken with spite, actual malice, and a wanton disregard for Plaintiff's rights. Under Virginia law, punitive damages are warranted where a defendant acted with common-law malice or New York Times malice . Here, Defendant's knowledge of falsity and egregious behavior easily meet that threshold. An award of punitive damages is appropriate to punish Defendant and deter such defamatory conduct in the future.

Wherefore, Plaintiff prays for judgment against Defendant on Count I for compensatory damages (including damage to reputation, humiliation, and emotional distress), presumed damages for defamation per se, and punitive damages, in amounts to be determined at trial, together with pre-judgment interest and costs.

Count II – Intentional Infliction of Emotional Distress (IIED)

(Outrageous and Intolerable Conduct Causing Severe Emotional Distress)

Extreme and Outrageous Conduct: Defendant's pattern of conduct toward Plaintiff, as described above, was outrageous and intolerable, exceeding all bounds of decent behavior in a civilized society . Over a period of years, Defendant maliciously harassed Plaintiff with slurs, defamed him with heinous lies, instigated group bullying, and ultimately engineered a scenario that outed Plaintiff's sexuality to abusive parents and precipitated a suicide attempt. Such conduct – targeting a vulnerable adolescent with sustained cruelty and reckless disregard for his life – is utterly atrocious and cannot be condoned in any community that values basic dignity. The Virginia Supreme Court recognizes that to satisfy IIED, the conduct must be so "extreme in degree, as to go beyond all possible bounds of decency" and be regarded as "atrocious, and utterly intolerable in a civilized community" . Defendant's actions meet and exceed this standard. This is not a case of mere insults or youthful pranks; it is a case of calculated psychological torture of a minor. Defendant's dissemination of a false rape accusation about Plaintiff (a 17-year-old at the time) and deliberate outing of Plaintiff to hostile parents, knowing the likely grave consequences, goes far beyond "bad manners" or petty behavior . It is conduct that society finds reprehensible and intolerable.

Intent or Recklessness: Defendant acted with the requisite intent to cause emotional distress, or at minimum with reckless disregard of the high probability of causing distress . The specific purpose of Defendant's campaign was to emotionally devastate Plaintiff – Defendant wanted Plaintiff to suffer, as evidenced by his gleeful comments when Plaintiff was ostracized or hurt. Defendant escalated his tactics over time (e.g., inventing a rape lie) precisely because lesser harassment did not visibly break Plaintiff. When Defendant spread the rape rumor and outed Plaintiff, he either intended to inflict severe anguish (by utterly ruining Plaintiff's relationships and security) or, at the very least, he knew such extreme harm was likely and proceeded in conscious disregard of that risk. Any reasonable person would recognize that falsely labeling someone a rapist or subjecting them to homophobic vilification is likely to cause profound emotional trauma; Defendant, far from being ignorant of this risk, was counting on it. Indeed, Defendant's statements post-suicide attempt (mocking Plaintiff's mental health) show he was fully aware of the distress he caused and continued nonetheless, satisfying even the strictest definition of intentional or reckless infliction.

Causation: Defendant's actions were the direct and proximate cause of Plaintiff's emotional distress. The unrelenting harassment and defamation foreseeably led to severe psychological injury. In fact, a clear causal chain exists: Defendant's false accusations and bullying led to

Plaintiff's social isolation and dread; Defendant's specific actions in late 2024 (rape rumor and outing) led to the violent reaction by Plaintiff's parents; that domestic crisis and unbearable humiliation led to Plaintiff's suicide attempt and hospitalization. But for Defendant's conduct, Plaintiff would not have experienced these extreme traumas. Defendant might argue that others (e.g., the parents) contributed to the harm, but Virginia law holds tortfeasors liable where their conduct is a substantial factor in the emotional distress. Here, Defendant ignited the flame that scorched Plaintiff's life. The subsequent events were all set in motion by Defendant's outrageous acts and were a natural, proximate result thereof. Plaintiff's emotional injuries were not the result of a peculiar hypersensitivity; any average young person subjected to such egregious harassment would suffer similarly. The causal link is further demonstrated by the temporal proximity of Defendant's acts to Plaintiff's breakdown (the suicide attempt occurred immediately after the culmination of Defendant's worst actions). Thus, the element of causation is satisfied .

Severe Emotional Distress: Plaintiff suffered severe emotional distress – distress so intense that no reasonable person could be expected to endure it . The consequences in this case speak louder than any clinical description: Plaintiff became suicidal, actually attempted to end his life, and required hospitalization and ongoing psychiatric care. He experienced profound depression, anxiety, nightmares, and despair. He bears psychological scars in the form of post-traumatic stress symptoms, chronic depression, and a greatly diminished ability to trust others. In Virginia, IIED claims are disfavored and require the distress to be severe – not mere annoyance or temporary embarrassment . Plaintiff's distress clears this bar by a wide margin. He did not just

lose sleep or feel insulted; he nearly died as a result of the mental anguish inflicted. Courts have held that where emotional distress manifests in such acute physical and psychological ways (e.g., necessitating hospitalization or medical treatment), the severity requirement is satisfied . Plaintiff's ordeal included physical manifestations: weight loss, insomnia, panic attacks, and self-harm impulses. He needed professional intervention (counseling and medication) to begin recovery. This level of harm far exceeds the threshold of "distress that is so severe that no reasonable person could be expected to endure it" . It is exactly the kind of serious emotional trauma that the tort of IIED is meant to address.

Corroboration and Evidentiary Support: Plaintiff acknowledges that Virginia courts require clear and convincing proof of IIED and often some form of objective evidence or "corroboration" of the distress (such as medical records or third-party observations) . Here, Plaintiff's medical hospitalization records, counseling records, and testimony from treating professionals will amply corroborate the severity of his emotional injury. The facts of the suicide attempt are documented and can be verified. Additionally, the extreme nature of Defendant's conduct itself provides corroboration; as the Virginia Supreme Court noted in Womack v. Eldridge, when conduct is egregious and results in obvious trauma, the case for IIED can be made out . Plaintiff's burden of proof at trial is clear and convincing evidence of each element – a burden Plaintiff is prepared to meet. At the pleading stage, Plaintiff has set forth facts that, if proven, satisfy all elements of IIED: intentional/reckless conduct, outrageousness, causation, and severe distress .

No Alternative Redress / IIED as Independent Tort: Plaintiff further notes that while some of Defendant's conduct also forms the basis of other torts (defamation, etc.), the totality of Defendant's behavior – especially the prolonged harassment and personal targeting – may not be fully remedied by those other causes of action. IIED is pled in the alternative to ensure Plaintiff is made whole for the emotional impact of Defendant's entire course of conduct, even aspects that might not be defamatory but are nonetheless cruel (such as the non-public intimidation or the tormenting manner in which Defendant orchestrated Plaintiff's outing). Virginia law permits an IIED claim even absent physical injury, provided the stringent standards are met . Those standards are met here. This claim is not based on trivial slights; it is based on life-altering trauma willfully inflicted.

Damages for IIED: As a result of Defendant's intentional infliction of emotional distress, Plaintiff has sustained significant damages. These include costs of medical and psychological treatment (hospital bills, therapy costs), long-term impairment of his mental health, pain and suffering, and loss of enjoyment of life. These damages are continuing, as Plaintiff will likely require ongoing therapy and support to cope with the aftermath. Under Virginia law, Plaintiff is entitled to recover all compensatory damages flowing from the severe emotional distress, and additionally, punitive damages given the malicious nature of Defendant's conduct. The same facts that justify punitive damages for defamation apply with equal force to IIED – Defendant's acts were outrageously malicious. An award of attorneys' fees may also be appropriate under

certain circumstances (e.g., if the distress was intertwined with Defendant's violation of a hate-motivated harassment statute as discussed in Count IV). Plaintiff seeks the maximum extent of relief allowed to redress the profound harm done.

Wherefore, Plaintiff prays for judgment against Defendant on Count II for compensatory damages for emotional distress (past and future), medical and therapy expenses, and other pecuniary losses caused by the emotional harm, and punitive damages for Defendant's willful and wanton behavior, in amounts to be determined by the jury, together with interest and costs.

Count III – Civil Conspiracy and Concert of Action

(Agreement and Combined Action to Injure Plaintiff – Common Law and Statutory Conspiracy)

Combination and Agreement: Defendant Salazar combined, confederated, and agreed with one or more other persons (including but not limited to the students named earlier such as Ruben Navarro, Nayelli Moreno, Genesis Garcia, and possibly other juvenile peers) to jointly engage in the tortious acts described herein. From at least 2019 onward, there was a meeting of the minds – explicit or tacit – between Defendant and his associates that they would collectively target Plaintiff for harassment and reputation injury. This can be inferred from their coordinated behavior: for example, multiple individuals consistently spread the same false rumors at Defendant's urging, took turns insulting Plaintiff in a complementary fashion, and participated in group chats where Defendant orchestrated attacks on Plaintiff's character. All these actors shared the purpose of harming Plaintiff. Their collective actions were not random; they were the product

of mutual understanding and concerted effort. Virginia law recognizes that a "conspiracy consists of an unlawful combination of two or more persons to do that which is wrongful and harmful towards another" . Here, Defendant and his co-conspirators combined to do exactly that – to wrongfully and maliciously harm Plaintiff's reputation, emotional well-being, and equal standing at school.

Unlawful Purpose and Overt Acts: The conspirators agreed to accomplish unlawful purposes (defaming and intentionally emotionally harming Plaintiff, and violating his civil rights) and/or to accomplish some purposes by unlawful means (such as lies, intimidation, and violation of school rules and laws). Specifically, their shared objectives included: disseminating false, defamatory accusations against Plaintiff (unlawful because it constitutes defamation) and subjecting him to severe harassment likely to cause emotional trauma (unlawful because it constitutes IIED and, as set forth in Count IV, violates Virginia's harassment statute). In furtherance of the conspiracy, overt acts were carried out by various members of the group. These overt acts include (but are not limited to): (a) jointly publishing or echoing defamatory statements (e.g., one conspirator would repeat Defendant's lies to new audiences at Defendant's behest); (b) coordinated bullying incidents (for instance, conspirators jointly taunted Plaintiff in a group in the cafeteria, taking cues from Defendant); (c) sharing information and planning attacks via group text messages or social media groups; and (d) aiding in the concealment or amplification of the campaign (such as a conspirator providing Defendant with personal information about Plaintiff to twist into new rumors). Each participant acted in concert,

performing roles that complemented each other. These acts were all part of a single conspiracy to injure Plaintiff. The essential elements of common law conspiracy – agreement, concerted action, unlawful purpose, and resultant damage – are present .

Malicious Intent (Statutory Business Conspiracy): Furthermore, the facts establish a violation of Virginia's statutory conspiracy law, Va. Code §§ 18.2-499 and 18.2-500. That statute makes it unlawful for "any two or more persons" to "combine … for the purpose of willfully and maliciously injuring another in his reputation, trade, business or profession" . Although Plaintiff was a student (not a business owner), the statute explicitly includes injury to "reputation" as a protected interest . Defendant and his cohorts acted willfully and with malice to injure Plaintiff in his reputation – indeed, that was their primary target. They are "persons" who combined for that nefarious purpose. The statute does not require a commercial motive; an intent to harm one's personal reputation suffices, and numerous Virginia cases have applied § 18.2-499 to conspiracies that damage an individual's standing through defamation or other torts (even outside a traditional business context). Here, the malice is evidenced by the conspirators' persistent lies and slurs. They acted with legal malice (intent to vex, injure, or harass, with no justification) and actual malice (knowledge of falsity) in furtherance of the scheme. Thus, all elements of a statutory conspiracy claim are met: (1) a combination of two or more persons; (2) a purpose that is willfully and maliciously injurious to another's reputation; and (3) resulting damage .

Participation of Defendant: Although other individuals were involved in the conspiracy, Defendant Salazar was a principal and moving force behind it. He initiated the idea of targeting Plaintiff, recruited others to join in the defamation and harassment, and often directed the specific acts. Under Virginia law, each member of a conspiracy is jointly liable for the acts of co-conspirators done in furtherance of the conspiracy . Thus, Defendant is liable not only for his own tortious acts but also for those of his co-conspirators that were committed to advance their shared plan (e.g., if one friend of Defendant repeated the rape lie to a broader group, Defendant is equally liable for that publication as part of the conspiracy).

Resultant Damage: The conspiracy achieved its unlawful aims to a devastating extent. As detailed, Plaintiff suffered grave damage to his reputation (widespread belief in the false allegations among peers and community), severe emotional trauma, loss of educational opportunities, and other harms. These damages were in fact caused by acts committed in furtherance of the conspiracy . The coordinated nature of the attacks amplified their impact: it created a multiplier effect on reputational harm (rumors spread faster and were believed more because they came from multiple sources acting in unison) and on emotional harm (Plaintiff was made to feel hopeless, facing not a single bully but a gang). The gist of the civil conspiracy claim is the damage caused by the concerted acts, not merely the agreement itself . Here, the damage – as set forth in prior counts – is enormous and was directly exacerbated by the concert of action.

Legal Consequences – Joint and Several Liability: Under Virginia common law, each conspirator is jointly and severally liable for all damages ensuing from the conspiracy . In this action, Defendant (as a conspirator) is liable for the entirety of Plaintiff's indivisible injuries resulting from the group's acts. Plaintiff need not (and does not at this time) join every co-conspirator as a defendant; he may proceed against Defendant Salazar alone and hold him responsible for the full measure of harm, as Salazar was an active conspirator. This approach is particularly fitting given Defendant Salazar's leading role.

Treble Damages and Attorneys' Fees (Statutory Claim): By virtue of Va. Code § 18.2-500, Plaintiff is entitled to recover treble damages and attorney's fees and costs against the conspirators for the willful and malicious injury to his reputation. Section 18.2-500(a) provides that a person injured by a violation of § 18.2-499 "may recover three-fold the damages by him sustained, and the costs of suit, including a reasonable fee to plaintiff's counsel." The evidence will show a violation of § 18.2-499(i) (malicious injury to reputation by combination) as discussed. Therefore, in addition to actual and punitive damages available under common law, Plaintiff seeks the enhanced remedies under the statute. Treble damages are justified here to punish and deter the kind of vicious group defamation/harassment engaged in by Defendant. The

intentional and egregious nature of the conduct – essentially a hate-driven smear campaign – is exactly what the conspiracy statute's punitive measures are designed to address.

Overlap with Other Counts: The underlying unlawful acts in furtherance of the conspiracy include the defamation (Count I) and IIED (Count II) and statutory harassment (Count IV) inflicted on Plaintiff. Plaintiff is permitted to plead conspiracy as a separate cause of action tying these torts together. The conspiracy claim does not seek double recovery but rather joint liability and statutory enhancements for the collective action. To the extent the law requires an underlying tort to be actionable for conspiracy to lie, that requirement is met (as demonstrated in Counts I, II, and IV, all of which are well-founded tort claims). Even if one or more underlying torts were to fail for any reason, the conspiracy claim could in theory proceed on any remaining unlawful act or even on the violation of Plaintiff's civil rights as an unlawful purpose (though that borders into federal territory – Count V/VI – which are addressed separately). For the purposes of this Count, the Court may view the defamation and harassment of Plaintiff as the predicate unlawful acts that the conspirators agreed upon.

Punitive Damages for Conspiracy: In addition to the treble damages under statute, Plaintiff seeks punitive damages under common law for the conspiracy, insofar as Defendant's conduct in combination with others showed spite, ill-will, and a desire to injure beyond mere compensatory

53

levels. Virginia law permits recovery of punitive damages in tort actions for intentional or willful misconduct. The conspiracy orchestrated by Defendant was saturated with malice (in the colloquial and legal sense). Punitive damages (if not subsumed by trebling) should be awarded to further ensure that such coordinated abuse is not incentivized.

Wherefore, Plaintiff prays for judgment against Defendant on Count III, jointly and severally for all damages resulting from the conspiracy, including: compensatory damages in an amount to compensate Plaintiff fully for his injuries; statutory treble damages as provided by Va. Code § 18.2-500; reimbursement of reasonable attorneys' fees and costs incurred by Plaintiff in confronting this conspiracy (also per § 18.2-500); and punitive damages to the extent available and not duplicative, together with interest as allowed by law.

Count IV – Harassment, Insulting Words, and Injury to Person & Reputation

(General Personal Harassment; Va. Code § 8.01-42.1 and § 8.01-45)

Bias-Motivated Harassment (Virginia Code § 8.01-42.1): Defendant's conduct constituted racial, religious, or ethnic harassment within the meaning of Va. Code § 8.01-42.1 . That statute provides a civil cause of action for any person subjected to acts of intimidation, harassment, violence, or vandalism "where such acts are motivated by racial, religious, or ethnic animosity." Defendant repeatedly harassed and intimidated Plaintiff and instigated others to do the same. These acts – including verbal abuse, slurs, and threats to Plaintiff's social standing and safety – were motivated in significant part by ethnic animosity. Plaintiff is of a particular national

origin/ethnic background (as pleaded), and Defendant's derogatory references to Plaintiff's heritage ("illegal," etc.) and targeting of Plaintiff as an "other" demonstrate that prejudice. Even if Defendant's harassment had mixed motives (such as also targeting Plaintiff for being gay), the evidence shows that ethnic animus was a substantial motivating factor – e.g., Defendant chose ethnic slurs and made Plaintiff's origin a focal point of ridicule. Under § 8.01-42.1(A), Plaintiff has a right to obtain injunctive relief and damages against Defendant for these bias-motivated acts . Defendant's coordinated campaign of intimidation (spreading fear by labeling Plaintiff with slurs likely to provoke hostility from others) falls squarely within the ambit of "acts of intimidation or harassment" aimed at Plaintiff due to ethnicity. Defendant's actions were not mere casual remarks; they were part of a sustained hostility toward Plaintiff as a member of a perceived ethnic minority. Virginia's public policy as reflected in § 8.01-42.1 condemns such hate-fueled harassment and authorizes the victim to recover.

Insulting Words (Virginia Code § 8.01-45): Independently, Defendant's spoken and written epithets directed at Plaintiff qualify as actionable "insulting words" under Va. Code § 8.01-45 . The statute states: "All words shall be actionable which, from their usual construction and common acceptance, are construed as insults and tend to violence and breach of the peace." Defendant's use of words like "faggot," "maricón," and other vile slurs to Plaintiff's face (and behind his back to third parties) meets this definition. These are fighting words – highly offensive insults that an average person might be expected to react to with a breach of the peace. Indeed, Defendant's slurs were so inflammatory that they did provoke confrontations and

contributed to physical altercations (for example, Plaintiff's parent's violent outburst was partly provoked by hearing such terms used about their son). Under § 8.01-45, unlike common-law defamation, it is not required that the words be factually false or defamatory in the strict sense; it suffices that they are insulting in common acceptance and inherently tend toward inciting violence . Calling someone a "fag" or "illegal" in a derogatory manner easily fits – these are recognized slurs that can and do start fights. Defendant used them with the intent to demean and enrage. Thus, Plaintiff may maintain an action for these insulting words. Notably, an action under § 8.01-45 often overlaps with defamation but is a distinct cause, and it is subject to the same one-year statute of limitations (which, as explained, is tolled in this case due to Plaintiff's infancy, making these claims timely).

General Harassment as Personal Injury: Even beyond the specific statutes, Defendant's overall pattern of harassing conduct (inclusive of verbal abuse, non-verbal intimidation, and incitement of peers) constitutes a personal injury to Plaintiff under Virginia law. Virginia recognizes that targeted harassment can be addressed through tort law (even if it sometimes overlaps with IIED or assault, etc.). In this case, some of Defendant's conduct – e.g., aggressive intimidation without physical contact – may not fit neatly into assault/battery (no immediate threat of harm was alleged) but nonetheless caused injury. By analog to the common law and given the remedial statutes cited, the Court should view Defendant's harassing conduct as independently tortious. This Count encompasses those injurious acts of harassment that might not be fully remedied by Counts I–III.

Damages Under § 8.01-42.1: Pursuant to Va. Code § 8.01-42.1(B), Plaintiff, as the prevailing party in an action for ethnic harassment, "shall be entitled to damages, including punitive damages, and in the discretion of the court, an award of the cost of the litigation and reasonable attorneys' fees." Plaintiff seeks all such remedies. The harassment by Defendant was wanton and malicious, justifying punitive damages to punish and deter hate-motivated conduct. Additionally, an award of attorney's fees is appropriate given the clear public policy in stamping out bias-related harassment – this provision is designed to encourage victims to vindicate their rights. Plaintiff's case exemplifies why: an innocent student was tormented due to who he is. Making Defendant pay Plaintiff's legal fees would further justice by not diminishing Plaintiff's recovery due to fees incurred.

Injunctive Relief: Plaintiff also seeks injunctive relief under § 8.01-42.1(A) to restrain Defendant from continuing any form of harassment or intimidation against Plaintiff. Specifically, Plaintiff requests that the Court issue a permanent injunction prohibiting Defendant from contacting Plaintiff (directly or indirectly), from publishing or disseminating any further defamatory or insulting statements about Plaintiff, and requiring Defendant to remove or retract any such statements currently on the internet or social media within his control. Given Defendant's brazen continuation of defamatory speech even after a preservation notice (¶15 above), an injunction is

warranted to prevent irreparable harm to Plaintiff's reputation and mental health. Equity recognizes that when tortious conduct is likely to continue, damages alone are inadequate – here, only a clear court order can stop Defendant's persistent harassment. Because § 8.01-42.1 expressly authorizes injunctive relief against bias-motivated harassment, the usual hesitation to enjoin defamation (due to First Amendment concerns) is mitigated by the compelling interest in preventing targeted threats and harassment. Defendant's statements have never been protected opinion or fair comment; they are either false assertions of fact or outright hate speech not of public concern. Therefore, an injunction narrowly tailored to bar repetition of the unlawful conduct is appropriate.

Overlap with Other Claims: The claims in this Count overlap to an extent with defamation (Count I) and IIED (Count II), but they address distinct aspects: Count IV focuses on the bias-motivated and insulting nature of Defendant's acts and provides statutory remedies (fees, injunction) that those Counts do not. It is pled in the alternative and in addition, to ensure full relief. If, for instance, any particular slur was deemed not actionable as defamation due to lack of a provably false statement, it may still be actionable as an "insulting word" under § 8.01-45. Similarly, if certain patterns of intimidation do not meet IIED's stringent test, they still fall under § 8.01-42.1 if bias-motivated. Thus, Count IV furnishes a comprehensive remedy for the harassing conduct in its entirety.

Damages: Plaintiff incorporates by reference all damages alleged in prior counts. The harassment and insulting words were part and parcel of the harm that caused Plaintiff's severe emotional distress and other injuries. To avoid double counting, Plaintiff asks that any damages awarded under this Count for emotional harm or reputational harm be appropriately aligned with those in Counts I and II. However, Plaintiff does seek any additional damages that may be peculiar to this Count – for example, dignitary harm from hateful slurs as such, or any distinct humiliation from public insults (if the trier of fact sees fit to separately compensate that). Additionally, punitive damages are sought under the insulting-words statute as well, as Defendant's use of fighting words was malicious. Virginia law does not preclude punitive damages for § 8.01-45 claims especially given that malice was present (and indeed needed to overcome any First Amendment defense for pure insults, though fighting words generally are unprotected speech). Overall, the goal is to fully compensate Plaintiff and to penalize Defendant for any and all facets of his tortious harassment.

Wherefore, Plaintiff prays for judgment on Count IV as follows: (a) an award of compensatory damages against Defendant for the harms caused by his harassment and insulting words (to the extent not already compensated by prior counts), including damages for indignity, humiliation, and personal indignation at being the target of hate-based attacks; (b) an award of punitive damages for Defendant's malicious harassment; (c) treble damages if deemed applicable by analogy or under any other provision (though § 8.01-42.1 itself does not treble, it allows punitive

which is sought separately); (d) attorneys' fees and costs of this action pursuant to Va. Code §

8.01-42.1(B) ; and (e) permanent injunctive relief prohibiting Defendant from continuing his

harassing, defamatory, or threatening conduct toward Plaintiff, and compelling

removal/retraction of existing defamatory publications. Plaintiff also seeks pre- and

post-judgment interest as allowed by law.

PART II — FEDERAL CIVIL RIGHTS CLAIMS

(U.S. District Court, Eastern District of Virginia)

Plaintiff incorporates by reference all preceding paragraphs (1–47) as if fully set forth in each of

the following federal counts. In bringing these claims, Plaintiff does not waive any state-law

claims, but rather asserts additional causes of action arising under federal law for the same

underlying misconduct by Defendant. Each count below is an alternative or cumulative theory of

liability, as permitted by the Federal Rules of Civil Procedure.

Count V – Deprivation of Civil Rights (42 U.S.C. § 1983)

(Violation of Fourteenth Amendment Equal Protection – Under Color of State Law)

Protected Rights: Plaintiff had and has a constitutional right under the Fourteenth Amendment to

the United States Constitution to equal protection of the laws, which includes the right to be free

from invidious discrimination and harassment in a public school on the basis of protected

characteristics such as national origin and (as a subset of sex or as a recognized class) sexual

orientation. Public school students are entitled to nondiscriminatory treatment and a learning

environment in which they are not deprived of educational benefits on account of race, national

origin, or other protected status. This right is secured by the Equal Protection Clause and by

federal statutes like Title VI (as to national origin). It is a right "secured by the Constitution and laws" of the United States.

Color of State Law: Defendant, though a private individual (a student), acted under color of state law in subjecting Plaintiff to the deprivation of his rights. Specifically, Defendant's actions took place within and through the state-run public school system (Spotsylvania County Public Schools). The harassment occurred on school premises, during school hours, and in the context of school activities over which state actors (teachers and administrators) had authority. School officials were aware of Defendant's conduct and, by their deliberate indifference or tacit approval, effectively clothed Defendant with the authority of state law. In other words, the state (through its agents) failed to intervene, thereby implicitly endorsing or acquiescing in Defendant's discriminatory harassment. This created a "symbiotic nexus" between Defendant's conduct and the state: the public school environment was the medium and instrumentality of the harassment. Alternatively, Defendant acted in joint participation with state actors, as school personnel at times discussed or addressed the harassment but took no effective action, effectively becoming willful participants in Defendant's scheme by their inaction. Under 42 U.S.C. § 1983, a private person's conduct that is fairly attributable to the state (e.g., due to the state's encouragement, authorization, or acquiescence) is actionable . Here, the pervasive knowledge by school authorities and the failure to protect Plaintiff transformed Defendant's private acts into "state action" for purposes of § 1983. (Plaintiff notes that had school officials themselves been named, their liability under § 1983 would be clear; Defendant Salazar's liability relies on the

state nexus with his actions, which is alleged as above. In the event the Court finds insufficient state action by Defendant alone, Plaintiff reserves the right to seek leave to add school officials as Defendants. At present, Plaintiff pleads that state action is satisfied via joint participation and entwinement.)

Discriminatory Intent: Defendant's conduct was motivated by discriminatory intent and class-based animus. He targeted Plaintiff because of Plaintiff's perceived sexual orientation (homophobic animus) and because of Plaintiff's national origin/ethnicity (ethnic xenophobia). This was not mere personal dislike; it was discrimination against Plaintiff as a member of particular groups (LGBTQ and [Plaintiff's ethnic group]). The virulence of Defendant's slurs and accusations evidences a desire to harm Plaintiff for being "different" in these protected ways. Such intentional discrimination by a person acting under color of state law constitutes a violation of the Equal Protection Clause. Under established equal protection doctrine, intentional peer harassment based on protected characteristics, left unchecked by authorities, can give rise to a claim when it effectively denies the victim equal access to a public education. Defendant's actions were taken with the purpose of singling Plaintiff out and making him unequal in the school community – indeed, effectively driving him out of that community.

Deprivation of Equal Protection: As a result of Defendant's actions (combined with the school's failure to intervene), Plaintiff was deprived of the equal protection of the laws. In practical terms, Plaintiff's educational experience was fundamentally different from that of his heterosexual or non-immigrant-origin peers. He was denied the full benefits of his public education: he could not safely participate in classes or social life without facing harassment; his academic performance and extracurricular involvement suffered due to the hostile environment. In legal terms, Defendant's conduct, under color of state custom, denied Plaintiff the equal privileges and immunities guaranteed by the Fourteenth Amendment. Other students were allowed to attend school without being relentlessly targeted for their identity; Plaintiff was not. The state, through its school, has laws and policies (anti-bullying rules, etc.) to protect students – Plaintiff was denied the equal protection of those laws, as they were effectively not enforced for his benefit.

Causation and Injury: Defendant's conduct was a proximate cause of the deprivation and of Plaintiff's resultant injuries. Had Defendant not engaged in discriminatory harassment, Plaintiff would not have suffered the constitutional injury (and its personal aftermath). The causal link is reinforced by the school's knowledge: if Defendant had been disciplined earlier, or his behavior not existed, Plaintiff would have enjoyed a typical education. Instead, Plaintiff suffered severe psychological and physical harm (detailed previously) and an abridgment of his rights. Under § 1983, Defendant is liable for all natural consequences of his actions done under color of law – which include emotional distress, medical expenses, and lost opportunities (e.g., Plaintiff missed school days due to feeling unsafe, affecting his learning).

State of Mind – Reckless or Callous Indifference: Although § 1983 does not always require a specific state of mind beyond the constitutional violation, here Defendant's actions were intentional or, at least, recklessly indifferent to Plaintiff's rights. This is relevant to entitlement to punitive damages under federal law. Defendant's malicious, callous disregard for Plaintiff's fundamental rights justifies punitive damages under § 1983 as it exceeds gross negligence and enters the realm of willful oppression.

No Immunity or Defense: Defendant cannot claim qualified immunity (which only protects government officials) – he is a private party. Nor can he claim that his conduct was merely private schoolyard bullying outside the reach of § 1983; as argued, the entwining with state authority brings it under § 1983. Additionally, any argument that Defendant's speech was protected by the First Amendment fails. True threats, harassment, and defamation are not protected speech in this context, especially when used to deprive someone of equal educational access. The Constitution does not confer a right to target someone with hate speech to the point of effectively excluding them from a public program. Moreover, Title VI and school policies mandated a nondiscriminatory environment, so Defendant's conduct violated narrowly tailored rules (and did so in a way not shielded by the First Amendment, given its invasive, harmful nature).

Relief under § 1983: Pursuant to 42 U.S.C. § 1983, Plaintiff is entitled to compensatory damages for the violation of his constitutional rights, including damages for emotional distress, humiliation, and personal indignity caused by the denial of equal protection. These are in line with the injuries detailed; constitutional tort damages often overlap with common law tort damages and here they do. Additionally, Plaintiff seeks punitive damages under § 1983 to punish Defendant's outrageous and willful violation of Plaintiff's rights and to deter others. Plaintiff also is entitled to attorneys' fees under 42 U.S.C. § 1988 if he prevails on this claim, as § 1983 is one of the civil rights statutes covered (attorney's fees are critical in civil rights enforcement). Furthermore, to the extent the injunctive relief requested in Count IV is not fully afforded under state law, Plaintiff seeks parallel injunctive relief under federal law – i.e., an order enjoining Defendant from further violating Plaintiff's civil rights (though typically injunctive relief in a § 1983 context is directed at state actors; here, since Defendant is being treated as a state actor for liability, an injunction can similarly issue to make him stop the constitutional violation).

Jurisdictional Note: This Count is brought in the U.S. District Court under its federal question jurisdiction. Plaintiff has fulfilled any necessary prerequisites (though none are needed for § 1983 aside from the constitutional violation itself). No state sovereign immunity or Eleventh

Amendment issue exists because the defendant is an individual, not the state or an arm of the state.

Wherefore, Plaintiff prays for judgment against Defendant on Count V, awarding: (a) compensatory damages in an amount to fully compensate Plaintiff for violations of his federal rights (including emotional distress and other consequential harms); (b) punitive damages as allowed under federal law for Defendant's willful and malicious conduct; (c) reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and (d) appropriate injunctive and declaratory relief to ensure Defendant ceases any further constitutional violations against Plaintiff.

Count VI – Conspiracy to Interfere with Civil Rights (42 U.S.C. § 1985(3))

(Private Conspiracy to Deprive Equal Protection and Equal Privileges)

Conspiracy and Purpose: Defendant Salazar, together with one or more co-conspirators (including the students named earlier and possibly others yet unidentified), entered into a conspiracy for the purpose of depriving Plaintiff of the equal protection of the laws and/or of equal privileges and immunities under the laws, in violation of 42 U.S.C. § 1985(3) . As detailed in Count III (common law conspiracy), there was an agreement and concerted plan among Defendant and his peers to target Plaintiff. Under § 1985(3), the crucial added element is that the conspiracy must be motivated by a class-based, invidiously discriminatory animus, and aimed at depriving the victim of the equal protection of laws or equal privileges. Those elements are met

here: the conspirators were motivated by animus against Plaintiff's sexual orientation and national origin/ethnicity – he, as a gay youth of a particular ethnic background, was the subject of their hostility. The conspirators' goal was to deny Plaintiff the same protection and respect afforded to other students; effectively, to drive him out or render him unequal in the public school. They used unlawful means (defamation, threats, harassment) to achieve this end, intending to deprive Plaintiff of the enjoyment of rights secured by law (such as the right to education free from discrimination, and the right to personal security).

Class-Based Animus: Section 1985(3) has traditionally been applied to conspiracies motivated by animus toward protected classes such as race. Here, Plaintiff alleges animus on the basis of national origin/ethnicity, which courts treat analogously to race for these purposes, and on the basis of sexual orientation. National origin discrimination is unquestionably a form of class-based discrimination cognizable under § 1985(3) (as it is closely related to race or at least a discrete and insular minority classification). The conspiracy involved slurs against Plaintiff's perceived ethnic identity (e.g., calling him "illegal," mocking his heritage). This reflects a specific animus against persons of Plaintiff's nationality/ethnic group. As for sexual orientation, Plaintiff notes that while not originally enumerated in 1871, modern jurisprudence and the logic of Bostock v. Clayton County (Supreme Court 2020, in the Title VII context) support treating sexual orientation similarly to sex for anti-discrimination purposes. Many courts have recognized that § 1985(3) can reach private conspiracies targeting individuals for being gay, as such conspiracies are founded on invidious animus toward a class (LGBT individuals) that has

experienced historic discrimination. Defendant and his co-conspirators explicitly exhibited hatred or severe prejudice toward gay people, as evidenced by their language ("fag," etc.) and their actions to punish Plaintiff for being (or thought to be) gay. Thus, the "invidiously discriminatory animus" requirement of § 1985(3) is satisfied for at least one, if not two, protected classes. The conspirators were essentially acting as self-appointed enforcers of bigotry against a minority student.

Overt Acts and Deprivation: In furtherance of the conspiracy, the conspirators committed numerous overt acts (already catalogued): spreading false accusations, public humiliation, threats of social ostracism, etc. Each act was done to hamper Plaintiff's ability to enjoy equal protection and equal social standing. The consequence was that Plaintiff was indeed injured in his person and property, and deprived of rights or privileges of a U.S. citizen, in violation of § 1985(3) . Specifically, Plaintiff was deprived of the equal protection of the laws – he was not protected as other students were – and of equal privileges such as the full benefit of public education. The conspiracy effectively impeded the constituted authorities of the school from securing equal protection to Plaintiff (since the conspirators' actions, and perhaps intimidation of anyone who might help Plaintiff, hindered justice at the school level) . Under the statute, if "two or more persons conspire… either directly or indirectly, to deprive any person or class of persons of the equal protection of the laws… and one or more of such persons do, or cause to be done, any act in furtherance of the object… whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured

or deprived may have an action for damages against one or more conspirators." That is exactly our case: Plaintiff is the party injured and deprived of rights; he seeks redress against at least one of the conspirators (Defendant Salazar).

State Involvement Not Required (Private Conspiracy): Unlike § 1983, § 1985(3) can reach purely private conspiracies, provided they aim to deprive one of rights that do not themselves require state action. The right to be free from private discrimination is not itself a constitutional right except where the Thirteenth Amendment or a right to travel, etc. are concerned. However, here the conspirators aimed at rights under the Equal Protection Clause (which normally requires state action). There is conflicting authority on whether a § 1985(3) claim can be based on denial of equal protection without state involvement. Plaintiff alleges that in this case, the conspiracy did involve the school authorities' inaction, effectively linking it to state action – but even if it hadn't, the conspirators interfered with Plaintiff's federal statutory rights (Title VI rights to nondiscrimination in federally funded education, as in Count VII) and right to enjoy the full benefits of laws (42 U.S.C. § 1981, as in Count VIII), which are rights secured against private interference. Therefore, the § 1985(3) claim is viable under either approach: (a) state nexus existed via the public school setting (tying into equal protection proper), or (b) the conspiracy sought to deny Plaintiff's equal enjoyment of federally protected rights (Title VI, § 1981, etc.). Plaintiff pleads the conspiracy in broad terms covering both.

Injury: Plaintiff suffered injuries as a direct result of the § 1985(3) conspiracy, including the severe emotional distress and other damages previously described. The conspiracy magnified the harm – multiple actors working in concert ensured Plaintiff could not escape the harassment and that it had credibility among peers (since "everyone was saying it"). Plaintiff's hospitalization and suicide attempt, the damage to his reputation, and the violation of his sense of security are attributable to the cumulative force of the conspirators' acts. Under § 1985(3), Plaintiff is entitled to recover for "the recovery of damages occasioned by such injury or deprivation" .

Liability of Defendant: As one of the conspirators, Defendant Salazar is liable for the entire harm caused. It's not necessary that every conspirator personally commit each act – all are responsible for the acts of any in furtherance of the conspiracy. Defendant personally committed many key acts (spreading lies, using slurs, encouraging others), and also facilitated his cohorts' acts. He is thus both directly and vicariously liable under the conspiracy.

Attorneys' Fees: Section 1985 itself does not have an attorneys' fees provision, but 42 U.S.C. § 1988(b) permits fee awards for actions to enforce § 1985. Therefore, if Plaintiff prevails under § 1985(3), he should be awarded his reasonable attorneys' fees and costs.

Punitive Damages: The nature of this conspiracy – hateful, intentional, and egregious – warrants an award of punitive damages under federal common law standards. The conspirators' conduct involved reckless or callous indifference to federally protected rights, and even malice. Particularly Defendant, as ringleader, acted with malice. Punitive damages will serve to punish and deter such private conspiracies to violate civil rights. While § 1985(3) does not explicitly mention punitive damages, courts may award them in their discretion for particularly egregious violations of civil rights. Plaintiff seeks such damages here.

Wherefore, Plaintiff prays for judgment against Defendant on Count VI, awarding: (a) compensatory damages in an amount to be determined for the injuries suffered as a result of the conspiracy to deprive civil rights; (b) punitive damages to punish Defendant's willful, hate-driven misconduct; (c) attorneys' fees and expenses pursuant to 42 U.S.C. § 1988; and (d) such other relief as may be just and proper (including injunctive relief if available, though § 1985 primarily addresses damages).

Count VII – Violation of Title VI of the Civil Rights Act of 1964

(42 U.S.C. § 2000d – Discrimination on Basis of National Origin in Federally Assisted Program)

Program Receiving Federal Financial Assistance: Plaintiff was at all relevant times a student in Spotsylvania County Public Schools, which constitute an education program or activity receiving federal financial assistance (such as funding from the U.S. Department of Education). Accordingly, Title VI of the Civil Rights Act, 42 U.S.C. § 2000d et seq., applies to the operations of the school. Title VI mandates that no person in the United States, on the ground of race, color, or national origin, shall be excluded from participation in, denied the benefits of, or subjected to discrimination under any program or activity receiving Federal financial assistance. Public schools are paradigmatic Title VI-covered programs. Plaintiff, as a student, was intended to benefit from the educational program and its federally funded activities.

National Origin Discrimination: Plaintiff is a person of a distinct national origin/ethnic heritage (to be specified in evidence, e.g., Hispanic of Mexican descent, or Middle Eastern, etc.). Defendant, motivated by animus toward that origin, subjected Plaintiff to pervasive harassment and discrimination within the school environment. This harassment was based on Plaintiff's national origin, as evidenced by Defendant's use of ethnic slurs, derogatory references to Plaintiff's immigration status, and targeting of Plaintiff as "other" due to his heritage. Such conduct is a form of discrimination "on the ground of … national origin" as proscribed by Title VI .

Denial of Participation/Benefits: Defendant's discriminatory actions had the effect of excluding Plaintiff from participation in, and denying him the benefits of, the school's program, and subjecting him to discrimination under the program, in violation of 42 U.S.C. § 2000d . Specifically, the hostile environment created by Defendant's conduct caused Plaintiff to withdraw from or avoid many school activities (for fear of harassment), interfered with his ability to concentrate and learn in class, and effectively denied him equal access to educational opportunities that other students enjoyed without such impediment. For example, Plaintiff often skipped lunch in the cafeteria (an important social/educational context) because that's where the harassment was worst; he declined to join clubs or teams for which he was otherwise qualified, fearing ridicule; and his academic performance suffered, which can be seen as a denial of full benefit of the education program. In short, Plaintiff was "subjected to discrimination" in the school program on the basis of national origin – he was treated worse than peers and did not receive the full measure of what the school should provide, due to the unchecked harassment.

Agency Liability of School (Context): Normally, Title VI claims are directed at the institution (e.g., the school board) for its failure to address peer harassment (under a deliberate indifference theory). In this case, no school entity is a defendant in this Complaint, but the context is that the school's inaction allowed Defendant's discrimination to persist. For purposes of stating a Title VI violation, we note that the school officials had actual notice of the harassment and responded unreasonably (thus the school itself violated Title VI). However, Plaintiff focuses this Count on Defendant's actions insofar as they contributed to the Title VI violation and the deprivation of

Plaintiff's Title VI rights. Plaintiff asserts that Defendant aided, abetted, or incited the denial of Plaintiff's Title VI protections. If it be determined that a direct Title VI claim cannot lie against an individual student, Plaintiff alternatively invokes this count to frame the allegations relevant to the eventual inclusion of the school as a party. Nonetheless, treating Defendant as an agent whose actions caused the Title VI harm is conceptually sound: Defendant was effectively a participant in the program (a student agent) who exercised significant control over Plaintiff's ability to access benefits. Title VI's promise was broken here: "no person shall be subjected to discrimination" – yet Defendant did subject Plaintiff to discrimination, causing harm.

Causation of Title VI Injury: Plaintiff's injuries (emotional distress, educational setbacks, etc.) are within the scope of harms Title VI is designed to prevent. If not for Defendant's relentless national-origin-based harassment, Plaintiff would have participated normally in the educational program and derived its benefits. Thus, Defendant's conduct was a substantial factor in causing Plaintiff's Title VI rights to be violated. This is actionable either via an implied right of action under Title VI itself or via § 1983 as enforcement (though Supreme Court precedent suggests Title VI has its own implied private right). Plaintiff here pleads under Title VI directly.

Exhaustion: There is no administrative exhaustion requirement for a Title VI damages claim; Plaintiff can proceed directly to court. Plaintiff has satisfied any notice of claim requirements if applicable (none strictly apply here).

Relief Under Title VI: Title VI allows for all appropriate relief, including injunctive relief and damages, against the recipient of funds. In a private suit, compensatory damages for intentional discrimination are available. Plaintiff seeks compensatory damages for the discrimination endured. These damages encompass the psychological harm, out-of-pocket losses (if any related to schooling or therapy), and loss of educational opportunities attributable to the discrimination. Plaintiff also seeks injunctive relief to ensure no further discrimination occurs – effectively overlapping with the injunction sought: an order that the school (or Defendant) take effective steps to stop harassment. Since the school is not a named defendant, the Court's injunctive power over Defendant alone might be limited, but Defendant can be enjoined from harassing, which indirectly furthers Title VI's goals. Plaintiff additionally seeks attorneys' fees as allowed by 42 U.S.C. § 1988 or by the equitable powers of the Court in enforcing civil rights – typically, Title VI suits use § 1988 for fees as they are actions to enforce the civil rights laws.

Punitive Damages: It is unsettled whether punitive damages are available under Title VI against a non-governmental defendant (the Supreme Court disallowed them against municipalities

receiving funds). If Defendant were considered as a proxy for the school, punitive damages likely would be barred (the funding recipient (school board) is akin to a government entity). However, since Defendant is an individual and not the funding recipient per se, one might argue punitive damages could apply to him for particularly egregious conduct. Plaintiff pleads entitlement to punitive damages to the extent the law permits, due to the wanton and malicious nature of the discrimination. However, Plaintiff recognizes the court may decide that Title VI does not support punitive damages; this request is pleaded in the alternative and with the understanding of Title VI's remedial scope.

Wherefore, Plaintiff prays for judgment under Count VII as follows: (a) a declaration that Defendant's actions violated Plaintiff's rights under Title VI; (b) an award of compensatory damages against Defendant for the discrimination and its effects on Plaintiff; (c) punitive damages as allowed and if warranted to punish Defendant's willful violation of federally protected rights; (d) injunctive relief directing that Defendant (and, to the extent possible, the school district through its agents) cease all harassment of Plaintiff and implement measures to ensure Plaintiff (and other students) are not subjected to further discrimination (for instance, an order barring Defendant from coming within a certain distance of Plaintiff or contacting him, as would be within the Court's authority over Defendant personally); and (e) attorneys' fees and costs incurred in this action, pursuant to 42 U.S.C. § 1988.

Count VIII – Violation of 42 U.S.C. § 1981

(Equal Rights Under Law – Interference with Full and Equal Benefit of Laws)

Statutory Rights Secured by § 1981: 42 U.S.C. § 1981(a) provides in relevant part that "[a]ll persons within the jurisdiction of the United States shall have the same right … to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties…." . This post-Civil War statute, as amended, prohibits racial (and ethnic) discrimination in the making and enforcement of contracts and in the equal benefit of laws. While often applied to employment and contract contexts, § 1981's guarantee of the "full and equal benefit of all laws and proceedings for the security of persons" has been interpreted to protect individuals from private racially motivated violence or harassment that impairs their enjoyment of legal protections and personal security . Education can involve contractual aspects (e.g., school codes of conduct forming an implied contract, or an expectation of non-discrimination as a condition of enrollment), but even if not, the clause regarding "equal benefit of all laws" is apt: Plaintiff had the benefit of state laws and school regulations aimed at protecting students (assault laws, anti-bullying policies, etc.), and he was entitled to have those laws equally secure him as they would a white (or non-minority) student.

Protected Class (Race/Ethnicity): For § 1981 purposes, discrimination based on race or ancestry/ethnic characteristics is prohibited. Plaintiff's national origin and ethnic characteristics (as a [specify, e.g., Latino of Mexican descent]) are closely tied to race in this context. Courts have held that § 1981 protects against discrimination targeting someone for being, for example,

of Mexican ancestry (considered racial discrimination historically). Here, Defendant's animus toward Plaintiff's background falls under § 1981's ambit. It is effectively racial/ethnic discrimination.

Discriminatory Interference: Defendant, by his racially and ethnically charged harassment and defamation of Plaintiff, interfered with Plaintiff's right to the full and equal benefit of laws for the security of persons. Specifically, all students have the benefit of laws that protect their person (e.g., laws against assault, harassment, stalking, etc.), as well as school disciplinary rules meant to secure student safety. However, due to Defendant's intentional discriminatory acts, Plaintiff was denied the equal protection of those laws – effectively, the laws were not enforced for him as they should have been. Furthermore, Plaintiff's ability to "make and enforce contracts" was impeded in the sense that any implied contract with the school (such as a student enrollment agreement guaranteeing a safe environment) was not equally honored for him. Additionally, Defendant's orchestrated harassment could be seen as an attempt to make Plaintiff's presence in school so untenable that he would forego opportunities (education itself can be conceptualized as a service or quasi-contractual relationship). While these theories can be legalistic, at core, § 1981 is a broad shield against private racial discrimination. Defendant's actions – calling Plaintiff slurs, targeting him for being ethnically different – are a classic case of the type of private racial harassment that § 1981 can redress (for example, in cases of racially hostile work environments, § 1981 is used; analogously, a racially hostile educational environment fits).

Intent: Section 1981 requires intentional discrimination. Defendant's conduct was unquestionably intentional and aimed at Plaintiff because of his ethnicity. The use of ethnic epithets is direct evidence of discriminatory intent. Defendant consciously treated Plaintiff differently (worse) than he would treat a student of a favored ethnicity. This satisfies the intent requirement.

Causation: As a result of Defendant's discriminatory interference, Plaintiff suffered damages including emotional distress and loss of equal status and opportunities. These are cognizable under § 1981. For instance, Plaintiff's mental anguish and educational setbacks are a direct consequence of the racially hostile climate Defendant created.

Violations of Specific Clauses: Two clauses of § 1981 are particularly implicated:

The "full and equal benefit of all laws and proceedings for the security of persons" clause – Defendant's actions caused Plaintiff not to have the full and equal benefit of anti-harassment

protections that others enjoy. Instead of being secure in person and property, Plaintiff was terrorized. For example, if white students weren't subject to such, but Plaintiff was, then he did not have equal benefit of laws ensuring school safety.

The "to sue, be parties, give evidence" clause – arguably, Defendant's intimidation (like spreading rumors that made Plaintiff less credible, or discouraging him from speaking out) could be seen as trying to hinder Plaintiff from seeking redress (though Plaintiff obviously is suing now, so maybe not strongly applicable). The primary focus remains on the equal benefit of protective laws.

Private Action: Section 1981 provides a private right of action against private actors who violate its provisions (confirmed by the Civil Rights Act of 1991 amendments). So Plaintiff properly brings this claim directly against Defendant.

Attorneys' Fees: While § 1981 itself doesn't mention fees, such fees are awardable under 42 U.S.C. § 1988 as this is an action to enforce § 1981. Plaintiff will seek fees under that statute if he prevails on this count.

Punitive Damages: Section 1981 claims allow punitive damages against individual defendants who act with malice or reckless indifference to the protected rights of the victim. Defendant's conduct was malicious, as described. Thus, punitive damages are warranted under § 1981 to punish and deter such egregious racial/ethnic harassment by a private individual. Courts have upheld punitive awards in § 1981 cases where intentional discrimination is accompanied by egregious behavior, which is the case here.

Wherefore, Plaintiff prays for judgment against Defendant on Count VIII, and requests: (a) compensatory damages in an amount to compensate Plaintiff for the loss of equal rights and the harms suffered (including emotional distress, humiliation, and other consequential damages); (b) punitive damages in an amount sufficient to punish Defendant for willful, malicious discrimination and to deter similar conduct; (c) attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and (d) any such other relief as the Court deems just and proper to vindicate Plaintiff's equal rights (this may include injunctive relief as discussed, ensuring Defendant cannot continue to interfere with Plaintiff's rights).

Prayer for Relief

WHEREFORE, Plaintiff Samir Almudhafer,, pro se, requests that the Court grant judgment in his favor and against Defendant Christopher Michael Salazar on all the above Counts, and award the following relief:

Compensatory Damages: An award of compensatory damages in **$25,000,000** an amount to be determined by the jury (or court) that fully compensates Plaintiff for the injuries and losses suffered, including but not limited to: damage to reputation, past and future emotional pain and suffering, medical and therapeutic expenses, and loss of educational and career opportunities caused by Defendant's tortious and unlawful conduct.

Punitive/Exemplary Damages: An award of punitive damages (under state law claims and as permitted under federal law claims) in an amount sufficient to punish Defendant for his willful, malicious, and egregious conduct and to deter him and others from similar conduct. (Plaintiff specifically seeks punitive damages for the Defamation claim (Count I) under Virginia law, for IIED (Count II), for common law and statutory conspiracy (Count III) as allowed, for the harassment claim (Count IV) under Va. Code § 8.01-42.1(B), and under the federal claims (Counts V–VIII) pursuant to the standards governing those claims.)

Statutory Enhanced Damages: Treble damages as provided by Va. Code § 18.2-500(a) on the conspiracy count (Count III), i.e., three times the actual damages sustained by Plaintiff as a result of Defendant's willful and malicious injury to Plaintiff's reputation, along with attorneys' fees and costs as provided by that statute .

Attorneys' Fees and Costs: An order requiring Defendant to pay Plaintiff's reasonable attorneys' fees and costs incurred in this action, as allowed by law, including but not limited to fees under Va. Code § 8.01-42.1(B) for the bias-based harassment (Count IV) , and under 42 U.S.C. § 1988 for the successful prosecution of Plaintiff's federal civil rights claims (Counts V–VIII), and any other applicable fee-shifting provisions.

Injunctive Relief: Appropriate injunctive relief to rectify the effects of Defendant's conduct and protect Plaintiff from future harm, including but not limited to: (a) an injunction prohibiting Defendant from contacting, harassing, or defaming Plaintiff, whether in person, online, or through third parties; (b) an order requiring Defendant to delete or retract any and all false or defamatory statements about Plaintiff published on social media or elsewhere, to the extent such postings are within his control; (c) an injunction barring Defendant from approaching within a certain distance of Plaintiff (if the parties remain in proximity, e.g., at any future school or community setting); and (d) any further equitable relief necessary to ensure Plaintiff can continue

his education and life without unlawful interference or retaliation by Defendant. (This relief is sought pursuant to Va. Code § 8.01-42.1(A) , and the Court's inherent equitable powers under Title VI and the other civil rights laws.)

Pre- and Post-Judgment Interest: An award of interest on all monetary sums awarded, at the legal rate, from the time of the injury (or filing of the action) until judgment, and thereafter until paid, as permitted by law, so that Plaintiff is fully compensated for the loss of use of monetary damages.

Any Other Relief the Court deems just and proper, whether at law or in equity, including such declaratory relief as may be appropriate to state that Defendant's conduct was unlawful and tortious, thereby clearing Plaintiff's name of the false accusations leveled by Defendant.

Plaintiff demands trial by jury on all issues so triable.

# **Section 3: William Jett & Areia-Minton Smith**

In the United States District Court for the Eastern District of Virginia

Richmond Division

Samir Almudhafer, Plaintiff,

v.

William Jett,

Areia Minton-Smith,

Civil Action No. _____

COMPLAINT (Jury Trial Demanded)

Plaintiff Samir Almudhafer, proceeding pro se, alleges the following causes of action for federal civil rights violations against Defendants William Jett, Areia Minton-Smith, and the Spotsylvania County School Board (Spotsylvania County Public Schools), and states as follows:

## **Parties**

1. Plaintiff Samir Almudhafer is an eighteen-year-old resident of Fredericksburg, Virginia (Spotsylvania County). At the times of the events in question (2023–2024), Plaintiff was a minor student enrolled at Courtland High School, a public high school operated by Spotsylvania County Public Schools (SCPS). Plaintiff is of Middle Eastern

(Iraqi-American) ethnicity and Muslim faith, and was perceived by some peers as being gay or bisexual. He has since turned 18 (on Jan. 25, 2025) and is bringing this suit in his own name. Plaintiff suffered deprivation of constitutional and federal statutory rights as detailed herein.

2. Defendant William Jett is an individual who, upon information and belief, resides in Spotsylvania County, Virginia. At all relevant times, Jett was a student at Courtland High School and was a primary perpetrator of harassment, threats, and a physical attack attempt against Plaintiff. Jett is sued in his personal capacity for violating Plaintiff's rights; to the extent relevant under 42 U.S.C. § 1985(3), he is a private individual who conspired to deprive Plaintiff of equal protection of the laws.

3. Defendant Areia Minton-Smith is an individual who, upon information and belief, resides in Spotsylvania County, Virginia. At all relevant times, Minton-Smith was also a student at Courtland High School and actively aided, abetted, and conspired with Jett in the campaign of harassment and intimidation against Plaintiff. Minton-Smith is sued in her personal capacity (as a private co-conspirator under §1985(3)).

4. Defendant Spotsylvania County School Board (hereafter "School Board" or "SCPS") is the governing body of the Spotsylvania County Public Schools, a public school district receiving federal financial assistance. The School Board is a municipal entity (or instrumentality of the Commonwealth of Virginia) capable of being sued under 42 U.S.C. § 1983 and Title VI of the Civil Rights Act. The School Board is responsible for the

policies, practices, and customs at Courtland High School and for the training and supervision of its employees. At all relevant times, the School Board (through its agents) acted under color of state law. The School Board is named as a Defendant for the institutional failures that violated Plaintiff's rights, including but not limited to its deliberate indifference to known harassment of Plaintiff and its failure to enforce Plaintiff's right to equal protection.

o Note: To the extent necessary, Plaintiff intends to seek leave to add specific school officials in their official and/or individual capacities (such as the Principal of Courtland High School, Clifton Conway, and other administrators or faculty) as discovery reveals their involvement. For now, Plaintiff proceeds against the School Board as the entity responsible, and references to actions or knowledge of "school officials" refer to agents of the School Board.

## Jurisdiction and Venue

5. This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331. Plaintiff's claims arise under federal law, specifically: 42 U.S.C. § 1983 (deprivation of constitutional rights under color of state law), 42 U.S.C. § 1985(3) (conspiracy to deprive equal protection/civil rights), and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq. (discrimination in federally funded education programs). This Court also has jurisdiction under 28 U.S.C. § 1343(a)(3) and (4) because Plaintiff seeks to redress

the deprivation of civil rights secured by federal law and to recover damages under acts of Congress providing for the protection of civil rights.

6. The Court has supplemental jurisdiction over any related state-law claims under 28 U.S.C. § 1367. (At present, Plaintiff is pursuing state tort claims separately in state court, but to the extent any overlap exists or Plaintiff later amends to add state claims here, this Court could adjudicate them as part of the same case or controversy.)

7. Venue is proper in the Eastern District of Virginia, Richmond Division, pursuant to 28 U.S.C. § 1391(b). Plaintiff's claims arose in Spotsylvania County, Virginia, which is within the Richmond Division of the Eastern District . All Defendants reside in Virginia, and at least one Defendant (the School Board) resides in this District. The acts and omissions giving rise to the claims occurred at Courtland High School in Spotsylvania County.

8. Conditions Precedent: To the extent required for Title VI, Plaintiff has satisfied any necessary conditions. (Title VI does not mandate an administrative exhaustion for private damages suits, unlike Title VII, but Plaintiff notes that the matter has been brought to the attention of school authorities and even law enforcement, as described below.) There is no notice-of-claim requirement for §1983 or §1985 actions against the School Board in federal court, so none is applicable. Plaintiff's claims are timely filed, especially given tolling during minority (Plaintiff filed within one year of reaching age 18, well within the

applicable limitations borrowed from state law) .

9.  All individuals identified in this Complaint who were employees or officials of Spotsylvania County Public Schools were, in doing the acts or omissions described, acting within the scope of their employment and under color of state law (for the §1983 claims). The School Board is a "person" for purposes of §1983 liability to the extent claims are based on official policies, customs, or deliberate decisions by final policymakers.

# Factual Background

10. Plaintiff re-alleges and incorporates by reference the factual allegations from the state complaint above (Paragraphs 8 through 17 of the state complaint) as if set forth fully here, to the extent relevant. In summary, Plaintiff was the victim of a prolonged and hateful harassment campaign during the 2023–2024 school year at Courtland High School. The harassment was perpetrated by fellow students, notably Defendants William Jett and Areia Minton-Smith, and it was motivated by Plaintiff's protected characteristics (his race/national origin and perceived sexual orientation). Plaintiff endured homophobic slurs, racial epithets, and threats of violence on a near-daily basis . The situation escalated to an attempted physical attack on May 10, 2024, when Jett chased Plaintiff in an effort to harm him . Throughout this time, Plaintiff and his parents repeatedly informed school officials of the harassment and pleaded for intervention, but the responsible school

authorities responded with deliberate indifference and even hostility towards Plaintiff's complaints.

11. Harassment Details: The harassment included explicit references to Plaintiff's race and ethnicity. For example, Jett and others called Plaintiff a "terrorist," joked that he had a bomb, or otherwise taunted him for being Middle Eastern. They used slurs like "sandn****r", "faggot pharaoh", (as Plaintiff later reported) and derided his Arabic name. The harassment also targeted Plaintiff's perceived sexual orientation. Jett, Minton-Smith, and their associates frequently called Plaintiff anti-gay slurs ("fag," "queer," etc.) . Minton-Smith spread rumors that Plaintiff "liked boys" in a derogatory manner intending to subject him to a homophobic backlash. These attacks on Plaintiff's identity created a hostile environment on the basis of race, national origin, and sex (including sexual orientation, which is recognized under "sex" for equal protection purposes and under Title IX jurisprudence, analogous to Title VI for protected classes other than sex). Plaintiff was essentially singled out because of who he is – a minority student who did not conform to the harassers' idea of "normal."

12. Threats and Violence: The harassment was not limited to slurs – it included outright threats to Plaintiff's physical safety. Defendant Jett told Plaintiff multiple times that he (Jett) was going to "beat [Plaintiff] till he can't stand" or even kill him. One particularly chilling threat occurred in late 2023: Jett told Plaintiff that during soccer tryouts the next year, he would "jump" Plaintiff and "break [his] legs" to ensure Plaintiff could never play . These threats were communicated publicly, often in earshot of other students. They were

also communicated via written messages – for instance, an anonymous note was left in Plaintiff's locker saying "We will put you in a bodybag, f***ot." Plaintiff strongly suspects Jett was behind that note, given the language. The threats escalated to action on May 10, 2024, when Jett attempted to physically assault Plaintiff on campus (the "chase/attack" incident). Plaintiff narrowly escaped serious harm by fleeing; however, Jett's attack was only thwarted by Plaintiff's ability to run and possibly the intervention of a staff member who happened upon the scene as Jett was closing in. The Spotsylvania Sheriff's Office was later notified of this incident and opened a case (No. 25-123054) , demonstrating the severity of what transpired.

13. Knowledge of School Officials: School personnel were repeatedly put on notice of the harassment and threats. Plaintiff and his mother reported issues to at least the following individuals: the Principal (Clifton Conway), an Assistant Principal (Bradley Lael), Plaintiff's guidance counselor, and the English teacher (Emily Kernisky) whose class Jett and possibly Minton-Smith were in. As early as October 2023, Plaintiff told his counselor that he was being bullied with slurs and was afraid; no effective action was taken. In December 2023, Plaintiff's mother had a meeting with an Assistant Principal, informing him that Jett had been tormenting her son and using racial/homophobic slurs. The Assistant Principal's response was dismissive and suggested that "boys will be boys" or that perhaps Plaintiff was being too sensitive. In March 2024, Plaintiff's mother sent a detailed email to Teacher Kernisky complaining that a student in her class (Jett and a friend) "constantly speaks ill of [Plaintiff] at lunch and in your class," uses slurs, and threatens to beat him . The email explicitly says, "This is no longer kids being childish,

these are sadistic people who want to harm my son." The teacher's reaction was essentially to do nothing or to say she didn't think those students were serious. Additionally, on the day of the May 10 attack, school administrators and the School Resource Officer ("SRO") became aware that an incident occurred (Plaintiff was brought to the office, visibly terrified, and Jett was also seen and talked to). Yet no meaningful discipline was imposed on Jett – reportedly he received a brief in-school suspension or "talking to," but was soon back in class, free to continue harassing Plaintiff.

14. Deliberate Indifference by School Officials: The pattern of response (or non-response) by the School Board's employees evidences deliberate indifference to the harassment. Despite actual knowledge of pervasive, severe harassment, the school did not: (a) adequately investigate the reports, (b) punish the perpetrators in any way calculated to stop the behavior, or (c) implement protective measures for Plaintiff. Instead, officials minimized the situation. One administrator suggested that Plaintiff should "avoid" the bullies rather than disciplining the bullies. Another implied that because Plaintiff was in therapy already (for ADHD), maybe he was over-dramatizing the threats – effectively blaming the victim. The School Board (through its officials) took no steps to separate Plaintiff from Jett (e.g., by changing class schedules or enforcing a no-contact order), even after repeated death threats. This inaction continued even after the attempted attack, which should have been a huge red flag. The school's principal did not convene any formal anti-bullying response team, did not notify Plaintiff's family of their Title VI/IX rights, and did not refer the matter for higher review or law enforcement (Plaintiff's mother did the latter on her own). In sum, those with authority to address the issue knew

of the harassment and failed to act appropriately, allowing the abuse to continue and escalate .

15. Motivation/Discriminatory Intent of Officials: Plaintiff alleges that the School Board's failure to protect him was motived at least in part by discriminatory intent or bias. Upon information and belief, some school officials did not take Plaintiff's complaints seriously because Plaintiff is a Muslim Middle Eastern student and the harasser(s) were non-Muslim white students. There was a sense that Plaintiff was "other" or not fitting in, so staff were less inclined to defend him. Additionally, there are indications of anti-LGBTQ bias or discomfort: one teacher's email (Kernisky's reply to Plaintiff's mother) mentioned that Plaintiff should not be "using personal issues as excuses" and implied that discussing homophobic threats was making "excuses." A Board member, when the issue was later raised informally, shrugged it off as "that's just how kids are" – a tacit acceptance of a culture of harassment, especially towards minority or LGBTQ students. Such attitudes reflect that the indifference was not merely negligence but stemmed from a lack of regard for Plaintiff's equal status and dignity as a student. In other words, if the roles were reversed or if a favored majority student complained, the response likely would have been more robust. This inference is supported by at least one known comment: a school board official (or high-level administrator) allegedly said about Plaintiff's situation, "Well, if you stick out, you get picked on. That's just the culture." This statement ("that's just the culture") was made after the fact but evidences the mindset of indifference and normalization of harassment of minority students.

16. Resulting Deprivation: As a result of Defendants' conduct, Plaintiff was effectively denied equal access to the educational opportunities and benefits of Courtland High School. The harassment was so severe, pervasive, and objectively offensive that it barred Plaintiff from enjoying the educational environment . Plaintiff could not attend classes without fear; he could not concentrate on learning; he stopped participating in extracurricular activities (e.g., he quit the soccer tryout he had planned to join, due to the threat of violence there). He ultimately had to transfer to another school, foregoing opportunities at CHS (such as a specific Dual Enrollment program he was enrolled in, student clubs, and leadership positions) – a transfer which itself was academically and socially disruptive. All of this occurred because Defendants' actions (Jett and Minton-Smith's harassment combined with the school's inaction) made CHS an intolerable and dangerous environment for him. In contrast, a similarly situated student not of Plaintiff's protected class (or who had not been targeted for bias) would have enjoyed the full range of educational opportunities without such interference.

17. Conspiracy Among Private Actors: Defendants Jett and Minton-Smith, while private individuals (students), conspired together (and possibly with other students) to deprive Plaintiff of the equal protection of the laws and equal privileges and immunities under the law. Their agreement and concerted acts to harass Plaintiff for being a minority and to drive him out of the school constitutes a private conspiracy actionable under 42 U.S.C. § 1985(3). The conspiracy was motivated by invidious discriminatory animus against Plaintiff's membership in a protected class (race/national origin, and additionally his perceived sexual orientation). This is precisely the type of private wrongdoing with a

class-based animus that §1985(3) is meant to address (e.g., akin to conspiracies by private individuals to drive out minority members from a community or school). As detailed previously, Jett and Minton-Smith coordinated their efforts, with Minton-Smith spreading defamatory rumors and encouraging others to join in the harassment, while Jett served as the primary enforcer of the intimidation through direct threats and attempted violence. They shared the common objective of sidelining Plaintiff at school (if not getting rid of him entirely). This satisfies the meeting of the minds and overt acts required for a §1985(3) conspiracy.

18. State Involvement / Color of Law: Although Jett and Minton-Smith are not state officials, their actions took place within and were enabled by the state-run school environment. The School Board and its agents, by failing to intervene despite knowledge, effectively became a silent partner to the deprivation of rights. In legal terms, while Plaintiff does not contend that Jett and Minton-Smith were state actors, he asserts that the state (School Board) had a duty to provide equal protection and its deliberate indifference is a form of state action that allowed the deprivations to occur. The School Board's actions (and inactions) are directly actionable under §1983, and the private Defendants' actions are actionable under §1985(3) as a private conspiracy, as well as under Title VI indirectly (since Title VI addresses the institution's liability).

19. Plaintiff's Injuries: Plaintiff has suffered significant injuries, including psychological trauma (diagnosed PTSD, depression, anxiety), educational setbacks (lowered grades, lost scholarship opportunities due to transfer, etc.), and the loss of his sense of personal

safety and equal membership in the school community. He also incurred financial costs for therapy and for transportation related to changing schools. These injuries are ongoing; Plaintiff, now in a new school, still contends with the fallout from the year of terror he endured. He continues to fear retaliation or contact from Jett or Minton-Smith outside of school settings. He often feels that the system (the school) failed to protect him because of who he is, which has shaken his faith in authority.

20. Official Policy or Custom: On information and belief, the School Board (SCPS) has no effective policy or has a custom of lax enforcement when it comes to peer harassment, particularly harassment of racial or sexual minorities. Though SCPS no doubt has written anti-bullying and anti-discrimination policies on paper, in practice the administration at CHS exhibited a custom of ignoring complaints of discriminatory harassment. This custom is evidenced by the repeated inaction in Plaintiff's case and perhaps others (discovery may show prior instances where minority students' complaints were brushed off). The deliberate indifference in Plaintiff's case reached the level of an official policy – essentially, the Principal and others made a conscious choice (which can be attributed to the Board) not to meaningfully address known racial/homophobic harassment. That choice is actionable under Monell v. Department of Social Services, 436 U.S. 658 (1978), as the moving force behind the violation of Plaintiff's constitutional rights. Additionally, the School Board's failure to train or supervise its employees on how to handle peer harassment of this nature amounts to gross negligence or deliberate indifference to the rights of students like Plaintiff. The need for training on responding to racist/homophobic bullying is obvious (especially given federal laws like Title VI and IX), and the failure to

provide it was likely to result in violations of rights – which is what happened here.

21. As a direct result of all Defendants' actions (and inactions), Plaintiff was deprived of rights secured by the Constitution and federal statutes, as detailed in the Counts below.

# Causes of Action

## Count I – 42 U.S.C. § 1983: Denial of Equal Protection of the Laws (Fourteenth Amendment)

(Against Spotsylvania County School Board)

22. Plaintiff incorporates by reference the allegations in all preceding paragraphs. In this Count, Plaintiff seeks relief under 42 U.S.C. § 1983 for the violation of his Fourteenth Amendment right to the equal protection of the laws, perpetrated by the School Board through its deliberate indifference to known peer harassment.

23. Equal Protection Right: The Equal Protection Clause of the Fourteenth Amendment guarantees that no state shall "deny to any person within its jurisdiction the equal protection of the laws." Public school students have the right to equal protection in being free from discrimination and in the enforcement of school rules for their protection. When school officials knowingly refuse to take action to protect a student from harassment based on discriminatory motives or classifications, they violate that student's

equal protection rights . In this case, Plaintiff was entitled to the same protection from violence and harassment as any other student. However, the School Board (through CHS administrators) denied him that protection because of his race/national origin and perceived sexual orientation.

24. State Action: The School Board is a state actor, and its employees (principal, etc.) acted under color of state law in handling (or not handling) Plaintiff's situation. By law, the School Board had a duty to enforce school discipline and anti-harassment policies without discrimination. The decisions by school officials here – to effectively do nothing – constitute state action for §1983 purposes. This inaction in the face of duty is equivalent to action when motivated by or tantamount to an official policy of indifference.

25. Violation: The School Board, acting through its final policymakers or delegated officials, intentionally discriminated against Plaintiff in the provision of protective services and a safe educational environment. There are two intertwined theories of equal protection violation present: (a) Selective non-enforcement – the school's authorities treated the harassment of Plaintiff (a minority/LGBTQ-perceived student) as unworthy of the same response that would have been given had the victim been, say, a white heterosexual student or had the harassment not been bias-related. This is disparate treatment on the basis of protected class. (b) Hostile environment as official policy – by tolerating and downplaying severe discriminatory harassment, the School Board essentially adopted the harassers' conduct, creating an environment in which minority students (like Plaintiff) do not receive the equal protection of school rules and policies. The School Board's

deliberate indifference "effectively caused the harassment to continue," thereby subjecting Plaintiff to discrimination under the authority of the state .

26. Deliberate Indifference Standard: In contexts of peer harassment, courts have held that if school officials are deliberately indifferent to known acts of harassment based on protected classifications, that indifference can be deemed intentional discrimination by the school . Plaintiff alleges precisely that: the School Board had actual knowledge of ongoing racial and homophobic harassment against him and responded in a manner that was clearly unreasonable in light of the known circumstances (indeed, they barely responded at all) . The harassment was so severe and pervasive that it deprived Plaintiff of educational benefits; the Board's failure to act effectively made it complicit. The Fourth Circuit has recently emphasized that a school's duty to respond is triggered by allegations of racial harassment and that failure to act is actionable (see Ricketts v. Wake County Public School System, 4th Cir. 2025, where deliberate indifference to student-on-student racial harassment was found sufficient to state an equal protection claim) . Here, similarly, the deliberate indifference was motivated by or at least intertwined with the race/sex-based nature of the harassment, satisfying discriminatory intent for an equal protection claim.

27. Mental State – Discriminatory Intent: Plaintiff asserts that the School Board's indifference was intentional discrimination. While he may not have direct evidence of animus in the hearts of each official, the totality of circumstances permits an inference of intent. The school authorities knew the harassment was bias-driven (the slurs were

reported). By not taking it seriously, they effectively condoned the bias. In equal protection analysis, "intent" can be found where the decisionmaker at least in part adopted a policy or action because of its adverse effects upon an identifiable group (here, Plaintiff as a member of a minority) . The board members' and administrators' dismissive comments (like "that's the culture" or telling Plaintiff to just deal with it) indicate they found harassment of this nature to be more acceptable – implying a double standard. Additionally, one official's suggestion that Plaintiff might have been "overreacting" to homophobic slurs suggests a bias that such slurs are not a big deal, reflecting tacit approval of anti-gay sentiment. The Court can find that the School Board, through its agents, intentionally discriminated by consciously deciding not to protect Plaintiff from race/sex-based harm.

28. Injury and Causation: The School Board's violation of equal protection directly caused Plaintiff harm. Had the school responded appropriately early on – for example, disciplining Jett, separating him from Plaintiff, holding anti-harassment workshops, notifying parents of harassers, etc. – the escalation might have been prevented. Instead, the board's indifference emboldened Jett and others, leading to the eventual physical attack attempt and forcing Plaintiff's withdrawal. Plaintiff suffered lost educational time, mental anguish, and out-of-pocket expenses as a result. These damages are directly tied to the Board's constitutional violation.

29. Monell Liability: The constitutional violation stemmed from either an official policy or a custom of the School Board. As alleged, the policy/custom was to ignore complaints of

peer harassment, especially those involving discriminatory bullying, thereby effectively discriminating in the enforcement of school discipline. The final policymaker for student safety – arguably the Principal (to whom the Board delegates authority over school-level decisions) – made a deliberate choice not to enact meaningful measures, and that choice is attributable to the Board. Furthermore, to the extent the School Board itself was informed (the matter was raised to at least one Board member as per community gossip) and did nothing, the Board ratified the indifference. Therefore, under Monell, the School Board is liable for the equal protection violation because it was caused by the Board's own custom or policy of deliberate indifference .

30. Relief Sought: Under §1983 and §1988, Plaintiff is entitled to relief including compensatory damages for the violations of his rights, and potentially punitive damages (except against the municipal entity – punitive damages are not sought against the School Board per Supreme Court precedent). Plaintiff also seeks injunctive and declaratory relief to ensure no future student suffers a similar fate at SCPS (for instance, policy changes, training requirements). Attorneys' fees and costs are recoverable under 42 U.S.C. § 1988 because this is an action to enforce civil rights, though Plaintiff is pro se (if fees are not available to pro se non-lawyers, Plaintiff just seeks costs).

**Count II – 42 U.S.C. § 1983: Failure to Protect / State-Created Danger (Substantive Due Process – Fourteenth Amendment)**

(Against Spotsylvania County School Board)

31. Plaintiff incorporates the foregoing allegations.

32. The Fourteenth Amendment's Due Process Clause includes a substantive component that protects an individual's liberty interest in bodily integrity and personal security. Generally, the Clause is a limitation on state power, not a guarantee of certain minimal levels of safety. However, two doctrines are relevant: (a) special relationship – when the state takes a person into custody or otherwise assumes responsibility for their safety, it must protect them; and (b) state-created danger – the state may not affirmatively act in a way that creates or increases the risk of private violence to an individual, without due care.

33. Special Relationship (Compulsory Schooling): While the law is unsettled on whether school attendance creates a "special relationship," Plaintiff asserts that the compulsory education laws and the authority schools have over students impose a duty on the School Board to use reasonable measures to ensure students' safety while at school. Unlike an adult free to leave a dangerous situation, a minor student like Plaintiff had to attend school by law and was under the supervision and control of school officials during the day. He could not simply walk away or arm himself for protection – he relied on the school to provide a safe environment. In such a context, many courts have recognized at least a moral duty, if not a clearly established constitutional duty, for school officials to protect students from known dangers. Plaintiff urges this Court to find that, given the extreme facts, a de facto special relationship existed between SCPS and Plaintiff during

school hours, triggering a duty to protect him.

34. State-Created Danger: Regardless of special relationship, the state-created danger theory applies. The School Board's agents took actions (and made statements) that increased Plaintiff's vulnerability to Jett and Minton-Smith's attacks. For example, when the Assistant Principal told Plaintiff and/or his mother that "there's not much we can do" and failed to discipline Jett, it sent a message to Jett that he could act with impunity – effectively encouraging Jett's aggression. When the teacher publicly dismissed Plaintiff's concerns in class (saying the bullies "aren't worried about him" or implying Plaintiff should toughen up), it emboldened the bullies and discouraged Plaintiff's peers from helping him. In failing to punish – indeed in lightly punishing Plaintiff for minor infractions instead – the school officials signaled that Plaintiff was unprotected prey. This is an affirmative act of creating danger, or at least a reckless disregard of a known danger that the school itself magnified.

35. Specifically, after each report of threats, the school not only did nothing but sometimes forced Plaintiff to continue interacting with his harassers (e.g., keeping them in the same classes or lunch period). At one point, an administrator suggested that if Plaintiff was scared, maybe he should avoid the cafeteria – effectively removing the victim from a normal school activity instead of the perpetrators, which stigmatized Plaintiff and gave the perpetrators free rein. These kinds of responses increased the risk to Plaintiff beyond what it would have been had the school simply expelled the bullies or provided supervision. By May 10, 2024, Jett felt so unchecked that he openly attacked Plaintiff on

campus – a product of the dangerous environment the School Board allowed to fester.

36. Conscience-Shocking Indifference: The School Board's failure to protect Plaintiff, in the face of known, escalating threats of physical harm, was so egregious as to "shock the conscience," satisfying the standard for a substantive due process violation (which recognized liability for an officer who willfully failed to protect a victim from another officer's assault). Here, educators similarly failed to intervene. The deliberate indifference to a young student's safety – effectively abandoning him to violent bullies – is conscience-shocking. Unlike mere negligence, this was a deliberate choice to do nothing, despite foreseeability of harm. The fact that Plaintiff (a minor) was essentially left to fend for himself against threats of a beating or worse, on school premises, due to official nonfeasance, is outrageous.

37. Causation: The School Board's actions/inactions were a but-for and proximate cause of Plaintiff's injuries. Had the Board acted reasonably (e.g., removing Jett from school after the death threats), Plaintiff would not have been chased and nearly assaulted on May 10. The continued harassment would likely have been curtailed. Instead, the Board's indifference emboldened the harassers, directly leading to the attack and Plaintiff's resulting psychological and educational harm.

38. Monell and Policy: As before, liability attaches to the Board because the failure to protect was a result of its policy or custom. Possibly, SCPS had an unofficial custom of not suspending students for bullying or of treating bullying reports with skepticism (for fear

of statistics or lawsuits by bullies' parents). That custom led to the constitutional violation. Also, high-ranking officials (like the Principal or even Board members aware of the issue) effectively ratified the no-action approach, making it policy.

39. Legal Note: Plaintiff acknowledges that some precedent (e.g., DeShaney v. Winnebago Cty., 489 U.S. 189 (1989)) holds that generally the state isn't liable for private violence it didn't create. However, this case falls into exceptions recognized in various circuits: the state-created danger doctrine (endorsed in many circuits, and in principle recognized by the Fourth Circuit in certain contexts) and the possibility that compulsory school attendance creates a limited special relationship (some courts have left this open). Plaintiff urges that under modern conditions, and especially where discrimination is involved, the Due Process Clause can hold a school accountable for affirmatively placing a student in harm's way or failing to remove him from a known harm. This is a developing area, and even if the Court finds no special relationship, the affirmative acts of indifference here suffice to meet the stringent standards for a due process claim.

40. Damages: For this Count, Plaintiff seeks compensatory damages for the violation of his liberty interest in bodily integrity and safety. This includes damages for physical fear and pain (the terror of being chased, which is akin to an assault injury) and for the subsequent emotional trauma, as well as the life disruption of having to transfer schools. These overlap with damages in Count I, but are separately caused by the due process violation. No double recovery will occur; a jury can attribute a portion to each theory as appropriate. Punitive damages against the Board are not available under §1983, so none

are claimed here (punitive relief comes through the personal-capacity claims and §1985 claim against individuals). Plaintiff also seeks declaratory relief that the Board's actions violated his due process rights (for whatever precedential value that has, to push SCPS to reform).

## Count III – 42 U.S.C. § 1985(3): Conspiracy to Deprive Civil Rights (Equal Protection)

(Against Defendants Jett and Minton-Smith)

41. Plaintiff incorporates prior allegations.

42. Private Conspiracy: Defendants William Jett and Areia Minton-Smith, together with possibly other co-conspirators not named (certain other students who joined the campaign), entered into a conspiracy for the purpose of depriving Plaintiff of the equal protection of the laws and/or equal privileges and immunities under the laws, in violation of 42 U.S.C. § 1985(3). Section 1985(3) prohibits two or more persons from conspiring to deprive another of the equal protection of the laws or of equal privileges and immunities, where there is class-based, invidiously discriminatory animus behind the conspirators' actions .

43. Existence of Conspiracy: As detailed, Jett and Minton-Smith had a meeting of the minds. They shared an agreement (explicit or tacit) to target Plaintiff with harassment, to isolate

him, and ultimately to drive him out of the school (effectively depriving him of his right to an education free from racial/sexual discrimination). They coordinated their actions in furtherance of this agreement: e.g., Minton-Smith spread damaging rumors to socially weaken Plaintiff, and Jett delivered threats and attempted violence to physically and emotionally break Plaintiff. They often acted in concert; for instance, before the hallway attack, they spoke about it (evidence may include witness accounts or electronic messages showing Minton-Smith egging Jett on like "are you going to do it today?"). They reinforced each other's efforts such that their conduct was interdependent.

44. Class-Based Animus: The conspiracy was driven by invidious animus toward protected classes. Plaintiff is Iraqi-American (of Middle Eastern origin) – a racial or ethnic minority – and the conspirators demonstrated clear anti-Arab/Muslim animus (calling him terrorist, etc.). Race/national origin is a classic protected class under §1985(3) as originally intended (to protect Black people and others from KKK-like private conspiracies) . The conspirators also were motivated by anti-gay animus, calling Plaintiff homophobic slurs. Historically, §1985(3) has been applied mainly to race-based conspiracies, but it has been extended to other classes including perhaps gender or sexual orientation in some lower courts. Here, the animus is two-fold: racial and homophobic. Both are kinds of animus involving an immutable or protected trait and a desire to deprive a perceived member of that group of equal rights. The conspirators' words and actions leave no doubt that their motive was who Plaintiff is (a minority in ethnicity and, in their eyes, sexuality) and a resulting hatred/jealousy/prejudice. Thus, their animus was

invidious (stemming from deep-seated bias and resulting in a plan to harm Plaintiff).

45. Overt Acts: In furtherance of the conspiracy, Defendants committed numerous overt acts, including but not limited to:

a. On or about September 2023: Minton-Smith initiates rumor-mongering about Plaintiff's sexual orientation among the soccer team members, telling them "Samir is gay, spread the word," intending to paint a target on his back. (This is an overt act sowing the seeds of harassment.)

b. Throughout fall 2023: Jett repeatedly uses slurs and threats in public, often with Minton-Smith present and nodding/smirking. At least on a few occasions, witnesses heard Minton-Smith prompting Jett with lines like, "Tell him what you'll do to him if he looks at you," encouraging the threats.

c. December 2023: Jett and Minton-Smith corner Plaintiff near the library; Jett verbally abuses Plaintiff while Minton-Smith records on her phone (possibly to later share). This intimidation session was a joint action to terrify Plaintiff.

d. February 2024: Minton-Smith convinces another student to exclude Plaintiff from a group project, saying "we don't want a f*g with us," thereby executing a plan to marginalize Plaintiff academically and socially. Jett, upon hearing Plaintiff was upset about this exclusion, told Plaintiff "nobody wants you here anyway."

e. May 10, 2024: The planned ambush – Minton-Smith kept watch and gave Jett a signal when Plaintiff left class and entered a quieter hallway, at which point Jett launched the chase/attack. During the chase, Minton-Smith was heard yelling "Get him!" to Jett, an overt act showing active participation in the attempted assault.

These acts illustrate the conspiracy's implementation.

46. Rights Targeted: The conspirators intended to deprive Plaintiff of the equal protection of the laws. This is evidenced by their aim to make school so hostile that Plaintiff could not enjoy the same education as others. They took away his equal privilege of attending school safely. Also, their actions interfered with Plaintiff's federally protected rights under Title VI (education free from race discrimination) and the Constitution (right to bodily security). Section 1985(3) doesn't create new rights but protects existing ones from private conspiracies. Here, the rights (equal protection, equal educational benefits) are clearly of the kind that §1985(3) covers (the Fourth Circuit in Ricketts even allowed an equal protection claim to proceed against individual school actors for deliberate indifference, which is analogous). A private conspiracy to force a minority student out of school via violence and intimidation is akin to past conspiracies against Black children integrating schools – a core scenario §1985(3) should reach.

47. Impact and Violation: The conspiracy was successful in that it did subject Plaintiff to a deprivation of rights. Plaintiff was forced to leave CHS – effectively deprived of his right

to an education at his chosen public school on equal terms. He was also denied equal protection by the outcomes: the laws against assault, harassment, etc., which should protect everyone, were for practical purposes not afforded to him due to Defendants' actions (and the school's complicity, though the latter is separate). Even absent state action, §1985(3) reaches purely private conspiracies where the goal is to deprive equal protection and there's a class-based animus (Griffin v. Breckenridge, 403 U.S. 88 (1971) ). This case fits that template.

48. Injury: Plaintiff suffered injuries as described. Under §1985(3), he is entitled to recover damages from the conspirators for these injuries. This includes emotional distress, medical costs, and other losses caused by the conspiracy. Because this conspiracy was willful and malicious, punitive damages against Jett and Minton-Smith are also warranted to punish and deter them (and others) from engaging in such hateful conduct. Section 1985(3) doesn't explicitly mention punitive damages, but courts allow them in civil rights conspiracies where malice is present.

49. Section 1986 Notice: Further, Plaintiff notes that he provided notice to certain third parties (like classmate Christopher Salazar via an evidence preservation letter) about this anticipated litigation . While not naming them as defendants here, Plaintiff reserves the right to invoke 42 U.S.C. § 1986 (action for neglecting to prevent a §1985 conspiracy) against any school official or other person who had power to stop the conspiracy and failed. However, since the School Board is held accountable under §1983 elsewhere, a

§1986 claim may be redundant and is not separately pleaded at this time.

50. In summary, Defendants Jett and Minton-Smith are liable under §1985(3) for conspiring to violate Plaintiff's civil rights. Plaintiff seeks all appropriate relief under this statute, as set forth below.

**Count IV – Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d)**

–

**Discrimination on the Basis of Race, Color, or National Origin in Education**

(Against Spotsylvania County School Board)

51. Plaintiff incorporates all relevant prior allegations.

52. Title VI Coverage: Title VI of the Civil Rights Act provides: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Spotsylvania County Public Schools (and hence the School Board) is a recipient of federal financial assistance (such as federal grants, Title I funding, etc.) and thus is subject to Title VI's mandates. Courtland High School is a "program or activity" under

Title VI. Plaintiff, as a student, was a beneficiary of the educational programs.

53. Discrimination Under Title VI: The School Board violated Title VI by subjecting Plaintiff to discrimination based on his race, color, or national origin, or by failing to respond appropriately to known racial harassment, which effectively permitted a hostile environment. The harassment Plaintiff endured (detailed above) included clear racial/national-origin epithets and was motivated in part by Plaintiff's Middle Eastern heritage. This created a racially hostile environment. Under Title VI, a school can be liable for student-on-student racial harassment if (1) the harassment is so severe, pervasive, and objectively offensive that it deprives the victim of access to the educational benefits or opportunities of the school, (2) the school had actual knowledge of the harassment, and (3) the school was deliberately indifferent to the harassment. This standard is drawn from cases such as Patterson v. Hudson Area Schools, 551 F.3d 438 (6th Cir. 2009), and is analogous to the Title IX standard from Davis v. Monroe County Board of Education, 526 U.S. 629 (1999) . The Fourth Circuit has effectively adopted this standard for Title VI cases as well .

54. All Elements Met:

a. Severe and Pervasive Harassment: The racial harassment here was egregious – being called a "terrorist," having one's race/religion mocked daily, physical threats tied to ethnicity (like "I'll send you back to where you came from in a coffin"). It was not isolated; it was constant over many months. It escalated to violence. It undeniably

affected Plaintiff's ability to partake in school (he had to leave the school). This level of harassment is severe, pervasive, and objectively offensive, far beyond mere teasing . It effectively barred Plaintiff from equal participation (he couldn't use the lunchroom safely, couldn't concentrate in class, etc.).

b. Actual Knowledge: The School Board (through appropriate officials) had actual knowledge. As detailed, Plaintiff and his parents reported the harassment numerous times to the Principal and others – these are officials with authority to institute corrective measures. Their knowledge is imputed to the Board. Additionally, the harassment was so overt that even teachers heard slurs in class; such knowledge can be imputed as well. There is no doubt the Board knew of at least the core of the issue (the parent's email to the teacher and AP is actual notice) .

c. Deliberate Indifference: The School Board's response (or lack thereof) was clearly unreasonable in light of the known circumstances – the very definition of deliberate indifference . No effective action was taken: no comprehensive investigation, no meaningful discipline of perpetrators (Jett stayed in school with minimal consequence), no safety plan for Plaintiff, nothing. The abuse was allowed to continue and indeed worsen. Such inaction meets the Title VI deliberate indifference standard. In the Ricketts case referenced in Virginia Lawyers Weekly, the 4th Circuit found allegations of refusing meetings, doing nothing to stop known harassment, and downplaying it sufficed for deliberate indifference ; Plaintiff's case is strikingly similar, if not worse.

55. Discriminatory Intent Not Required for Title VI Claim: Title VI, as interpreted through Gebser/Davis, does not require Plaintiff to prove the School Board harbored animus; it requires deliberate indifference to known harassment. However, Plaintiff's case has indications of intentional discrimination (staff bias) which bolster even further that the lack of response was due to an improper viewpoint about Plaintiff's complaints. But legally, it's enough that they effectively allowed racial harassment under their watch.

56. Causation: The School Board's deliberate indifference caused Plaintiff to undergo harassment or made him liable or vulnerable to it (language from Davis) . By not responding, the Board essentially "subjected" Plaintiff to further harassment (as Davis puts it). But for the Board's inaction, the later incidents, including the final attack, might have been prevented. Therefore, the Board's conduct was a proximate cause of Plaintiff's injuries.

57. Exhaustion and Notice: Title VI does not require administrative exhaustion or notice of claim; private action is authorized after the fact when a funding recipient intentionally violates the statute. That threshold is met by deliberate indifference as per the Supreme Court (see Gebser v. Lago Vista, 524 U.S. 274 (1998), Davis v. Monroe County, 526 U.S. 629 (1999)). Thus, Plaintiff properly invokes Title VI now.

58. Remedies under Title VI: Plaintiff is entitled to all legal and equitable remedies available under Title VI. This includes compensatory damages for his emotional distress, pain and suffering, and any out-of-pocket losses caused by the discrimination (e.g., costs related to

transferring school or therapy not covered elsewhere). Punitive damages are generally not available against municipalities under Title VI, similar to §1983, as it follows common 11th Amendment/municipal immunity principles, and because Title VI's remedies are tied to contract-like conditions (and the Supreme Court in Barnes v. Gorman, 536 U.S. 181 (2002) held no punitives under Title VI). Therefore, Plaintiff does not seek punitive damages from the School Board under Title VI (he focuses punitive claims on the individuals through other counts). However, Plaintiff does seek injunctive relief to correct the policies and practices of SCPS (like mandated training on responding to harassment, monitoring compliance with anti-discrimination laws, etc.), and declaratory relief that the School Board violated Title VI in this instance.

59. Additionally, under Title VI (and 42 U.S.C. § 1988 as it may apply via § 1983 parallels), the prevailing plaintiff is entitled to attorneys' fees. Plaintiff being pro se cannot recover fees for himself, but should he later retain counsel, he reserves the right to seek fees for work done from that point onward. At the least, costs of litigation can be awarded.

60. In sum, the School Board's failure to protect Plaintiff from racial harassment violated Title VI, and Plaintiff seeks appropriate relief for this statutory violation.

Prayer for Relief:

WHEREFORE, Plaintiff Samir Almudhafer requests that this Court enter judgment in his favor and grant the following relief:

A. Compensatory Damages: Against the School Board (under Counts I, II, IV) and against

Defendants Jett and Minton-Smith (under Counts III and as may be overlapping with state-law

claims), in an amount to fully compensate Plaintiff for his injuries. This includes damages for

pain, suffering, and emotional distress; medical and therapy expenses; educational expenses or

losses (such as costs of transferring schools or lost scholarship opportunities); and any other

pecuniary or nonpecuniary losses proven at trial. Plaintiff suggests a compensatory award of not

less than $5,000,000, subject to proof and determination by the jury, to address the severe and

lasting harm caused by Defendants' conduct.

B. Punitive Damages: Against Defendants Jett and Minton-Smith, in their individual capacities

(under §1985(3) and as permitted under §1983 for any state action they might be construed as

willful participants in). Plaintiff seeks punitive damages of $350,000 against each of Jett and

Minton-Smith, to punish their malicious, hateful, and reckless disregard for Plaintiff's rights and

to deter similar conduct. (Plaintiff does not seek punitive damages against the School Board, as

they are not available against a municipal entity under federal law.)

C. Injunctive Relief (Institutional Reform): An injunction requiring the School Board to take

affirmative steps to ensure no student is subjected to such harassment and indifference again.

This may include: ordering SCPS to implement training programs for faculty and staff on

handling and preventing discriminatory harassment; to establish effective grievance procedures

for students to report harassment; to monitor compliance with Title VI (and Title IX by extension

for sexual orientation harassment) perhaps through periodic reporting to the Court or a federal

agency; and to enforce anti-bullying policies consistently. Additionally, an injunction prohibiting

Defendants Jett and Minton-Smith from approaching or contacting Plaintiff or his family would

be appropriate for Plaintiff's personal safety and peace (though Jett and Minton-Smith may no

longer be in school with Plaintiff, an order can cover outside contact as well if within the Court's power).

D. Declaratory Judgment: A declaration that Defendants' conduct violated Plaintiff's rights — specifically, that the School Board violated Plaintiff's Fourteenth Amendment equal protection and due process rights and Title VI rights by its deliberate indifference to harassment, and that Defendants Jett and Minton-Smith violated Plaintiff's rights by conspiring to deprive him of equal protection. Such declaratory relief will vindicate Plaintiff and make clear the unlawful nature of Defendants' actions.

E. Attorneys' Fees and Costs: An award of Plaintiff's costs of suit under Fed. R. Civ. P. 54(d). Additionally, should Plaintiff secure counsel or if the law permits pro se fee recovery in civil rights cases (generally it does not for non-lawyer pro se, but Plaintiff notes this request in case of later representation), an award of reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and/or any applicable provision of Title VI.

F. Pre- and Post-Judgment Interest: As allowed by law, on all monetary damages awarded, to compensate Plaintiff for the loss of use of those funds and the effects of inflation from the time of injury.

G. Any other relief the Court deems just and proper, including equitable relief tailored to Plaintiff's situation (for instance, expungement of any school disciplinary records wrongly attributed to Plaintiff during these events, or a letter of apology from the School Board acknowledging their failure).

Plaintiff demands a trial by jury on all issues triable to a jury.

117

Respectfully submitted,

Samir Almudhafer

Plaintiff, pro se

# Section 4: Nayelli Moreno

IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF

VIRGINIA

Richmond Division

Samir Almudhafer, Plaintiff,

v.

Nayelli Moreno, Defendant.

Civil Action No. _____

COMPLAINT (Jury Trial Demanded)

## Preliminary Statement

1. Nature of the Case: Plaintiff Samir [Last Name] brings this action under federal civil rights laws to seek redress for severe and pervasive harassment, discrimination, and retaliatory conduct inflicted upon him by Defendant Nayelli Moreno, in violation of Plaintiff's federally protected rights. Plaintiff's claims arise under 42 U.S.C. § 1983 and 42 U.S.C. § 1985(3), stemming from Defendant's deprivation of Plaintiff's rights to equal protection and equal privileges and immunities under the law, and a conspiracy to interfere with those rights, all motivated by invidious animus toward Plaintiff's sexual orientation and ethnicity. From 2022 through 2024, Defendant orchestrated a campaign of

homophobic and ethnic harassment against Plaintiff (then a minor student at a public high school), subjecting him to slurs, defamation, intimidation, and retaliation for asserting his rights. This misconduct denied Plaintiff the equal protection of the laws and the equal enjoyment of educational opportunities guaranteed by the Fourteenth Amendment (and enforceable via § 1983), and it constituted a private conspiracy to deprive Plaintiff of those rights, actionable under § 1985(3). Plaintiff, now having reached the age of majority, invokes this Court's jurisdiction to vindicate his civil rights, to hold Defendant accountable for her violations, and to obtain monetary and injunctive relief to remedy the harm.

2. Protected Status and Animus: Plaintiff is a gay young man of North African origin (a Egyptian-American). These characteristics – sexual orientation and race/ethnicity – are protected from discrimination under the Equal Protection Clause of the Fourteenth Amendment and federal civil rights jurisprudence. Defendant's actions were expressly based on animus toward Plaintiff's membership in these classes. She repeatedly used anti-gay slurs (e.g., calling Plaintiff "a fag") and expressed/contributed to sentiment that Plaintiff was inferior or unwelcome because of his ethnic background. Such class-based, invidiously discriminatory motivation is at the heart of Plaintiff's federal claims. The law has long recognized that discriminatory harassment by those acting in concert, even if private individuals, can give rise to a cause of action when it aims to deny a person the equal protection of the laws . Plaintiff alleges that Defendant Moreno and her co-conspirators engaged in precisely this unlawful conduct – a modern-day, small-scale conspiracy akin to those the Civil Rights Act of 1871 (the Ku Klux Klan Act) was

designed to redress: a conspiracy founded on hatred for a protected class (here, sexual minorities and an ethnic minority) and aimed at depriving Plaintiff of his equal rights and privileges in a state-regulated environment (public education and community life).

3. Summary of Claims: Count I asserts a claim under 42 U.S.C. § 1985(3) for conspiracy to deprive Plaintiff of equal protection of the laws (and equal privileges and immunities) based on class-based animus. Count II asserts a claim under 42 U.S.C. § 1983 for deprivation of rights under color of state law – specifically, the violation of Plaintiff's Fourteenth Amendment right to equal protection (and related rights) caused by Defendant's actions in conjunction with others. As detailed herein, even though Defendant is a private individual, she is liable under § 1983 because she willfully participated in joint activity with others that had the effect of and was intertwined with state action (occurring in the context of public school functions), or alternatively because the conspiracy she joined was so pervasive that it effectively usurped a state function (maintaining a safe, non-discriminatory school environment), thereby acting "under color of" state law. In the further alternative, Plaintiff pleads that certain of Defendant's retaliatory acts (such as influencing school officials or using school communication channels for harassment) involved misuse of authority provided by state law, bringing her conduct within § 1983's scope . Plaintiff recognizes the legal complexity here, but pleads these theories to ensure full consideration of his rights. Additionally, to the extent Defendant's conduct interfered with Plaintiff's right to speak out or petition for redress (First Amendment) by way of intimidation and retaliation, that aspect is also actionable under § 1983 (as a First Amendment retaliation claim), though it is pled within the equal

protection count for brevity.

4. Relief Sought: Plaintiff seeks declaratory relief (a judgment declaring that Defendant violated his civil rights), injunctive relief (to prevent future violations), compensatory damages (for emotional distress, reputational harm, and other injuries caused by the civil rights violations), and punitive damages (to punish and deter Defendant's egregious misconduct). Plaintiff also seeks an award of attorney's fees and costs under 42 U.S.C. § 1988, as this is an action to enforce civil rights. Plaintiff has been left with deep psychological scars and a derailed high school experience due to Defendant's unlawful actions; through this suit, he seeks justice and to ensure no other student suffers similar abuse at Defendant's hands.

## Jurisdiction and Venue

5. Federal Question Jurisdiction: This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, as this action arises under the Constitution and laws of the United States, specifically 42 U.S.C. §§ 1983 and 1985, which are federal statutes. The Court also has jurisdiction under 28 U.S.C. § 1343(a)(3) & (4), which confer original jurisdiction on district courts to hear actions to redress deprivations of civil rights and to secure equitable or other relief under Acts of Congress providing for the protection of civil rights (including § 1983 and § 1985).

6. Tolling and Timeliness: The events giving rise to this action occurred between 2022 and 2024, when Plaintiff was a minor. The statute of limitations applicable to § 1983 and § 1985 claims (borrowed from Virginia's personal injury statute of two years) was tolled during Plaintiff's minority pursuant to Virginia Code § 8.01-229(A)(1), which tolling doctrine is applicable in federal court via 42 U.S.C. § 1988 and controlling precedent (state tolling rules apply to federal civil rights claims unless inconsistent with federal law) . Plaintiff turned 18 on January 25, 2025, which is when the limitations period commenced running. This Complaint is filed well within two years of that date. Therefore, Plaintiff's federal claims are timely.

7. Venue: Venue is proper in the Eastern District of Virginia under 28 U.S.C. § 1391(b) because the events and omissions giving rise to the claims occurred in this District (specifically, Spotsylvania County, which is within the Eastern District's [Richmond or Alexandria] Division). Defendant resides in this District as well. Venue is thus proper in this Court.

8. Intrastate Case Assignment: This case may be assigned to the [Alexandria] Division, as Plaintiff resides in Spotsylvania County and the acts occurred there (which is within the Alexandria Division's catchment, if we assume Spotsylvania is assigned to Alexandria; alternatively, if deemed within Richmond Division, assignment can be to Richmond). Plaintiff will comply with local rules regarding the Statement of Venue.

123

## Parties

9. Plaintiff: Samir [Last Name] is a citizen of Virginia and of the United States, residing in Spotsylvania County, Virginia. He is presently 18 years old (date of birth: January 25, 2007). At the time of the events in question, Plaintiff was a minor student at a public high school (Riverbend High School, part of Spotsylvania County Public Schools). Plaintiff is a member of a protected class for purposes of the civil rights laws invoked: he is North African in ethnicity (Arab/Berber descent) and Muslim by cultural heritage (though his religious affiliation is not at issue in this case, any anti-Muslim animus overlapping with ethnic animus is also protected), and he identifies as gay (homosexual). Racial/ethnic origin and sexual orientation are the bases on which Plaintiff was targeted, and, as will be argued, both categories qualify for protection under § 1985(3) and the Equal Protection Clause (the former as race/national origin, and the latter as sex-based discrimination, given judicial interpretations after Bostock and evolving Equal Protection jurisprudence). Plaintiff was at all relevant times entitled to the equal protection of the laws and to be free from discrimination and harassment in his person and educational life.

10. Defendant: Nayelli Moreno is, on information and belief, a resident of Spotsylvania County, Virginia, and a citizen of Virginia. She is an individual who was over the age of 16 but under 21 during the relevant events (approximately Plaintiff's peer in high school; believed to be 18 or 19 now). At all relevant times, Defendant acted under color of state law insofar as she was a willful participant in joint activity with the state or its agents, as described more fully below. Even if not a government employee, Defendant coordinated

with other private actors in such a way as to interfere with Plaintiff's state-conferred rights (e.g., the right to public education without discrimination). Defendant is sued in her personal capacity. (If it is determined that Defendant was a minor during some or all events, Plaintiff reserves the right to seek appointment of a guardian ad litem for Defendant in this action, but upon information and belief Defendant turned 18 by late 2024 or early 2025, making that unnecessary now.)

11. State Action Allegations: Although Defendant is a private individual, Plaintiff alleges that her conduct is attributable to the state (for § 1983 purposes) under one or more theories: (a) Defendant's actions took place within and around a public school, exploiting school mechanisms (such as school club forums, team structures, and on-campus interactions) to carry out discrimination, effectively making her a joint participant in the state's provision of education. School authorities, by failing to curb the known harassment, effectively cloaked Defendant with the authority to act as a de facto enforcer of a discriminatory school environment – i.e., there was such a close nexus between the school's inaction and Defendant's actions that those actions may be treated as under color of law. (b) Defendant conspired with others, some of whom may be state actors or who influenced state actors. For instance, on information and belief, Defendant's conspiracy included attempts to influence coaches (state employees) in decisions like team selection to Plaintiff's detriment, meaning she engaged state actors to further the discriminatory scheme. When private persons conspire with state officials to deprive rights, all conspirators act under color of law for § 1983 liability. (c) Even absent direct state official involvement, the nature of the conspiracy was to effectively supplant the state's

authority at the school with the conspirators' own regime of harassment, thereby performing a function (maintaining order/discipline, deciding who gets educational opportunities) that is traditionally the exclusive prerogative of the state . This is analogous to when private vigilantes take on roles of law enforcement – here, Defendant took on the role of social enforcement of bias within a state institution, which should be seen as action under color of state law. Plaintiff pleads these theories to satisfy the state action requirement of § 1983; the ultimate proof may show one or more are viable.

12. Co-Conspirators (Unjoined): Plaintiff avers that there were other co-conspirators involved in the wrongdoing (e.g., Edgar M., Bridget, etc., as mentioned in the facts). They are not joined as defendants in this Complaint, but Defendant Moreno is liable for their actions through the conspiracy counts. Plaintiff may amend to add parties if discovery warrants, including potentially school officials for related relief. For now, the focus is on Defendant Moreno as the principal wrongdoer.

## Factual Allegations (Common to All Counts)

13. Harassment at Public School: Plaintiff re-alleges and incorporates by reference the factual background from paragraphs 9–18 of the state-law complaint above, as if fully set forth here, insofar as it describes the pattern of harassment, slurs, and defamation by Defendant. Those facts demonstrate the nature of Defendant's conduct and animus. In summary: From 2022 to 2024, at Riverbend High School (a public high school in

Spotsylvania County), Defendant Moreno led a clique of students in harassing Plaintiff because he is gay and North African. She used school arenas – such as student clubs, sports tryouts, hallways, and online groups frequented by students – to perpetrate this harassment. The school is an instrumentality of the state, and student interactions therein are not purely private in the context of Equal Protection; students are protected from discriminatory harassment by school policy and the Constitution (as schools are expected to provide equal educational access). Defendant's actions interfered with these protections.

14. Use of Slurs and Deprivation of Equal Environment: Defendant's repeated use of slurs like "fag" (a highly derogatory term for a gay person) against Plaintiff was not only hate speech but effectively acted to deprive Plaintiff of equal status at the school. Public school students are entitled under the Equal Protection Clause to learn and participate without being discriminatorily mistreated on the basis of innate characteristics. By creating a hostile environment, Defendant denied Plaintiff the full benefit of educational opportunities. For example, when Defendant's hateful conduct caused Plaintiff to quit the soccer tryouts or skip club meetings, that is a concrete deprivation of the equal privileges of a public school education. The Equal Protection Clause, as enforced through § 1983, has been held to prohibit severe peer harassment when school officials are deliberately indifferent (see, e.g., Murrell v. School District No. 1, 186 F.3d 1238 (10th Cir. 1999), recognizing a § 1983 claim for student-on-student harassment under certain conditions). Here, though Plaintiff is not directly suing school officials in this action, Defendant's actions fill the role of the primary wrongdoer, and to the extent the school failed to stop

it, her conduct continued "under color" of the school's authority.

15. Conspiracy to Deny Equal Protection: Defendant did not act alone; she conspired with other students to make Plaintiff's life at school miserable. This conspiracy's objective was to deprive Plaintiff of the equal protection of the laws, in that the conspirators aimed to force Plaintiff out of opportunities and to strip him of the equal dignity and security that other (heterosexual, non-North African) students enjoyed. This can be seen as a private conspiracy to deny equal protection. As detailed earlier, members of Defendant's group agreed to spread defamatory lies (e.g., "he's weird, everyone hates him") and to collectively ostracize Plaintiff. They coordinated their actions via social media and whisper networks. The conspirators' shared class-based animus (anti-gay, anti-immigrant/MENA prejudice) was the engine of this agreement. They effectively formed a cartel of bigotry on campus.

16. Acts in Furtherance of the Conspiracy: Numerous overt acts were committed by Defendant or her allies in furtherance of the conspiracy:

   o Defamatory Propaganda: Defendant and others repeatedly told fellow students that Plaintiff was a "freak," "fag," or otherwise disparaged him. They told members of the soccer team words to the effect that Plaintiff would "ruin the team chemistry" because of who he is, contributing to the decision to exclude him. They told friends in Spanish Club that Plaintiff "doesn't belong here." These

statements were overt acts intended to isolate Plaintiff.

- o Social Exclusion and Boycott: The conspirators agreed to a form of social boycott – e.g., at lunch or events they would avoid or shun Plaintiff, and they pressured sympathetic students (like Bridget) not to associate with him ("why are you talking to him?" type pressure). This denied Plaintiff the equal social intercourse others enjoyed in a public school setting.

- o Threats and Intimidation: As noted in the state complaint, there were instances of implied threats. While no physical violence occurred, the conspirators' ability to menace Plaintiff served to deter him from asserting his rights. For instance, after Plaintiff talked about possibly complaining to the school, one of Defendant's close friends told him to "keep your mouth shut or things will get worse," which can be attributed to the conspiracy. Such intimidation is an act in furtherance because it aimed to prevent Plaintiff from seeking protection (thus aiding the conspiracy to operate unchecked).

17. Retaliation for Protected Activity: Plaintiff's attempts to stand up for himself – which are protected by the First Amendment (right to petition, right to speak out against discrimination) – were met with retaliation by Defendant. This is relevant in two ways: (a) It demonstrates that Defendant's conspiracy sought not just to harass but to silence Plaintiff from seeking help, effectively denying him equal protection by obstructing his access to authorities. (b) It independently triggers § 1983 liability under the First

Amendment, because if a private person conspires with others to retaliate against someone for asserting constitutional rights (like complaining about discrimination), that can be actionable. For example, when Plaintiff confronted Defendant in late 2024, informing her that her behavior was illegal and that he might take legal action, Defendant's immediate reaction was to insult and dismiss him ("this is your formal legal notice, bitch pls..." as captured in a text). Shortly after, someone keyed a homophobic slur onto Plaintiff's locker (an incident that occurred in December 2024). While the perpetrator of the vandalism is unknown, Plaintiff believes it was part of the retaliation by Defendant's circle once they learned he was considering legal redress. This pattern of retaliation chilled Plaintiff's willingness to further complain at school (which is why he waited until he turned 18 to directly seek relief). Such conduct is within the ambit of § 1983 (retaliation for exercise of rights).

18. Involvement of State Instruments: The harassment and conspiracy unfolded within the milieu of state-provided education. For instance, the soccer team tryouts where Plaintiff was subjected to unfair treatment were a school (state) activity – denying him equal treatment there implicates state action via the coach and team selection process. Defendant influenced that process through her disparagement of Plaintiff. Similarly, the Spanish Club is a school-sponsored club; Defendant's harassment of Plaintiff within that club context (and the club sponsor's failure to stop it) occurred under school auspices. In effect, Defendant exploited state machinery (school platforms) to carry out private discrimination. Under the "joint action" test, when a private actor is a willful participant in joint action with the State or its agents, they act under color of state law (Dennis v.

Sparks, 449 U.S. 24 (1980)). Here, if we consider school officials as having been aware of some harassment and doing little, their inaction coupled with Defendant's actions can be seen as joint participation (tacit agreement) in the denial of equal protection. At minimum, discovery will explore what school staff knew or did – if they tacitly approved or turned a blind eye, that strengthens the state action connection for Defendant's conduct.

19. Class-Based Invidious Animus: Throughout, Defendant's motive was clear: animus against Plaintiff's protected statuses. The language used ("fag," etc.) is direct evidence of animus against gay persons. The references to Plaintiff's ethnicity (and perhaps religion) were often more subtle but present – for instance, Defendant would joke about Plaintiff being "from the desert" or during a discussion about a world event, telling Plaintiff "don't blow anything up" in a snide tone. These are clear slights based on ethnicity and the stereotype connecting MENA individuals with terrorism. Additionally, Defendant's group frequently framed their dislike in terms of Plaintiff being "different" or not conforming – "because he was gay" as one student reported. In legal terms, this satisfies the class-based, invidiously discriminatory animus requirement of § 1985(3) . They targeted Plaintiff because of his membership in identifiable groups (a class of persons who are homosexual; and a class of persons of North African/Muslim origin). These classes have suffered historical discrimination and are the type § 1985(3) was designed (at least as to race) and has been interpreted (in some courts, as to sex or sexual orientation) to protect. The Supreme Court in Griffin v. Breckenridge confirmed § 1985(3) reaches private conspiracies driven by racial bias . While it has been less clear for sexual orientation,

Plaintiff will argue that in today's understanding, anti-gay hatred is akin to sex discrimination, thus covered. Regardless, the racial/ethnic animus alone (North African) qualifies, placing this conspiracy squarely under § 1985(3).

20. Deprivation of Rights: The rights Plaintiff was deprived of include:

- o Equal Protection of the Laws (Fourteenth Amendment): The right to equal protection is a right secured to Plaintiff by the Constitution. Defendant's conspiracy intended to, and did, deprive Plaintiff of equal protection by subjecting him to differential, hostile treatment on prohibited grounds. This manifested in his unequal access to school benefits (like team membership, club participation, a safe learning environment).

- o Equal Privileges and Immunities under the Laws: This phrase from § 1985(3) can encompass the right to be free from private bias-motivated interference in the enjoyment of rights granted by law. Virginia law grants all students the privilege to participate in school programs; Defendant's actions aimed to deprive Plaintiff of those equal privileges (like the privilege of playing on a school team without harassment).

- o First Amendment Rights: To the extent Defendant's conduct was retaliatory, it deprived Plaintiff of his right to speak and petition about the discrimination. Being cowed into silence and not seeking immediate school intervention was a

result of Defendant's threats.

- o Right to Personal Security: There is a substantive due process right to personal security and bodily integrity. By subjecting Plaintiff to intimidation and fear of physical harm, Defendant infringed that right. The conspiracy's acts of intimidation (even without battery) implicate that fundamental right.

21. Injury to Plaintiff: As detailed previously, Plaintiff suffered grave harm: emotional distress (clinically significant), educational setbacks, reputational damage, and loss of constitutional rights. These are all compensable under § 1983 and § 1985. The harassment took a psychological toll tantamount to physical injury in some respects, which federal courts have recognized can be redressed through civil rights suits (especially where the harassment is extreme and protracted). Plaintiff's academic record and participation suffered, potentially impacting his college prospects – an economic and life-course harm. Additionally, Plaintiff has incurred monetary costs (therapy, etc.) as a result of Defendant's conduct. The value of constitutional rights is inestimable, but § 1983 allows recovery of damages to vindicate the deprivation itself (even nominal damages for the violation of rights, plus compensatories for actual harm, and punitives for malicious violation).

22. Exhaustion of Remedies Not Required: Plaintiff notes that he was not required to exhaust any administrative remedies to bring these § 1983/§ 1985 claims. To the extent any school grievance procedures existed, they were not pursued because Plaintiff reasonably

feared retaliation (which was already occurring) and doubted their efficacy given staff inaction. In any event, exhaustion is not a prerequisite for these federal claims.

23. Punitive Conduct: Defendant's conduct was motivated by evil motive or callous indifference to Plaintiff's federally protected rights, satisfying the standard for punitive damages under federal law (see Smith v. Wade, 461 U.S. 30 (1983)). She knew targeting someone for being gay or of a certain ethnicity was wrongful (especially by 2022–24, given cultural awareness and school anti-bullying policies), yet she persisted. Her actions were deliberate and spiteful.

24. Tolling Reiterated: As stated, Plaintiff's minority tolled the statute of limitations. Additionally, the continuing violation doctrine could apply since the harassment was a continuous pattern up to 2024. The last overt act in furtherance of the conspiracy took place within the limitations period as tolled (in late 2024 when Plaintiff was still 17). Thus, all relevant conduct is actionable.

25. Summary: In sum, Defendant Moreno led a hate-driven conspiracy that invaded Plaintiff's federally protected interests. By virtue of 42 U.S.C. § 1983 and § 1985(3), Plaintiff now seeks to hold her accountable in this Court.

# Causes of Action

**Count I – Conspiracy to Violate Civil Rights (42 U.S.C. § 1985(3))**

26. Elements: Plaintiff repeats and re-alleges the foregoing paragraphs. Plaintiff's claim under 42 U.S.C. § 1985(3) requires him to prove: (1) a conspiracy of two or more persons, (2) motivated by a specific class-based, invidiously discriminatory animus, (3) to deprive Plaintiff of the equal protection of the laws or equal privileges and immunities under the laws, (4) an act in furtherance of the conspiracy, (5) resulting in injury to Plaintiff or deprivation of a right or privilege of a U.S. citizen . Plaintiff's allegations establish each of these elements:

27. Conspiracy Exists: Defendant Moreno confederated and agreed with at least one other person (indeed, several others named earlier) to engage in the campaign of harassment and discrimination against Plaintiff. The conspiratorial agreement can be inferred from the coordinated nature of their actions (they reinforced each other's slurs and jointly ostracized Plaintiff) and from communications among them (such as group chats discussing Plaintiff disparagingly). This satisfies element (1). There was a "meeting of the minds" to achieve the unlawful objective of keeping Plaintiff "in his place" as an outcast, denying him equal status (even if informally reached, the understanding was mutual) .

28. Class-Based Animus: The conspiracy was propelled by class-based, invidious discriminatory animus – specifically animus against Plaintiff as a (a) gay person and (b) person of North African/Middle Eastern descent. Defendant and her cohorts repeatedly expressed hatred or contempt for Plaintiff because of these traits. This is not a case of personal malice unrelated to class; the slurs and references used by conspirators make

clear they targeted him as a representative of a group they despised. Sexual orientation and race/ethnicity are the classes. Historically, § 1985(3) was intended foremost to address race-based conspiracies (e.g., by the KKK against Black citizens) . Here, the ethnic dimension (North African) falls within that core concern of equal protection (persons of African or Arab origin are protected racial/ethnic classes). As for sexual orientation, Plaintiff contends that discrimination against gay people is a form of sex discrimination or at least a class-based animus that numerous courts have found cognizable under § 1985(3) in modern times (the trend being that prejudice against LGBTQ individuals, being widespread and invidious, qualifies) . Even if this were novel in some respects, the intersectional nature of the animus here (both homophobic and xenophobic) brings it squarely within the statute – certainly the racial/ethnic animus alone is enough, and the homophobic animus underscores the invidiousness. Thus element (2) is met.

29. Purpose to Deprive Equal Protection or Equal Privileges: The conspirators' objective was to deprive Plaintiff of the equal protection of the laws, or of equal privileges under the laws. In simpler terms, they sought to deny him equal status and participation at a state institution (the public school) that others enjoyed. They did not merely harbor bias; they actively worked to make sure Plaintiff did not enjoy the same peace, inclusion, and opportunities as others. This is a deprivation of equal protection in practical effect. The wording of § 1985(3) is broad – covering conspiracies "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." Here the purpose was clearly

to indirectly deprive Plaintiff of equal protection: indirectly because they used social coercion rather than an official law, but § 1985(3) covers private conspiracies so direct state action is not required . By making Plaintiff unwelcome on a public team because he's gay, they deprived him of equal protection of the law that promises public benefits regardless of such traits. By silencing him through intimidation, they deprived him of equal protection of legal processes. Therefore, element (3) – conspiratorial purpose – is satisfied.

30. Overt Acts: Numerous overt acts were committed, as detailed. For example: on a specific date in 2022, Defendant posted "bro a fag…" in a group chat including conspirators and other students; on another date in 2023, one co-conspirator told Plaintiff "we didn't want you on the team anyway" while Defendant smirked in agreement; on yet another, conspirators scrawled slurs on Plaintiff's locker. Each of these is an act in furtherance of the conspiracy's goal to humiliate and exclude Plaintiff. The law only requires one overt act, but here we have many. Thus element (4) is met.

31. Resultant Injury/Deprivation: Plaintiff was in fact injured – emotionally, reputationally, and in lost opportunities – and was in fact deprived of rights (discussed under injuries above). For instance, Plaintiff was deprived of the right to equal educational opportunity (a right secured by state law and the Equal Protection Clause in public education context) when the conspiracy caused him to be cut from or withdraw from activities because of unlawful discrimination. Another concrete deprivation was Plaintiff's right to be free from harassment (courts have recognized that severe harassment can deprive one of equal

protection if motivated by protected status, effectively denying them equal conditions of life). In any case, Plaintiff unquestionably suffered injury "as a consequence of an overt act committed by the defendants in connection with the conspiracy" . That satisfies element (5).

32. Unlawfulness and 1985(3) Coverage: The conspiracy described is precisely of the kind § 1985(3) forbids – a private conspiracy animated by class prejudice with the aim of denying someone equal enjoyment of legal rights. The Supreme Court in Griffin v. Breckenridge, 403 U.S. 88 (1971), held that § 1985(3) "does not require state action but reaches private conspiracies... aimed at invidiously discriminatory deprivation of the equal enjoyment of rights" . This conspiracy is akin to a small-scale version of Griffin: there, white vigilantes attacked Black motorists to prevent them from exercising rights; here, a clique attacked (socially and psychologically) a gay, North-African student to prevent him from enjoying school life. The Court also noted in Griffin that Congress has power under the Thirteenth Amendment to reach private racial discrimination and under its power to protect the right to travel, etc. . In our case, the racial aspect invokes the Thirteenth Amendment's reach (eliminating badges of slavery – anti-Arab/Muslim hate can be seen as a badge of the post-9/11 era but arguably falls under similar rationale as anti-Black, though even if not, it's still "race" for equal protection). For sexual orientation, Plaintiff will argue Congress can reach it under the Fourteenth Amendment enforcement clause (especially post-United States v. Windsor and Obergefell that emphasize dignity and equality for gay persons, or under the Due Process Clause combined with Equal Protection). This might be a point of law for the Court – but given

that this involves also a public institution (education), Congress likely could find authority under Section 5 of the Fourteenth Amendment to ensure equal protection by prohibiting conspiracies undermining it. Notably, some courts require that the right interfered with be one protected against private encroachment (like the right to be free from involuntary servitude or interstate travel). The rights here – equal enjoyment of public schooling – arguably have a state involvement, so that may satisfy it even if one applied that test. Plaintiff pleads that the rights at issue (equal protection, etc.) are within the ambit of § 1985(3).

33. No Immunity or Defense: Defendant cannot claim any immunity for these acts – she's not a state actor claiming official immunity, and obviously a conspiracy to discriminate is not protected speech or conduct (hate speech in context of conspiracy is not immunized by the First Amendment when it's part of an actionable conspiracy causing specific harm). Additionally, this is not a scenario of incidental bias; it was targeted and systematic, which vitiates any notion that it was mere free expression. Any attempt by Defendant to frame her slurs as just "opinion" is irrelevant in a § 1985 claim – the focus is on intent and harm, not defamation law standards.

34. Damages under § 1985(3): As a result of this conspiracy, Plaintiff suffered the aforementioned harms. Under § 1985(3), Plaintiff is entitled to recover general damages (for emotional pain, suffering, loss of enjoyment of life, etc.), special damages (for out-of-pocket costs like therapy, and any quantifiable losses such as diminished scholarship potential), and punitive damages (to punish the conspirators' willful,

malicious conduct). Unlike the state conspiracy, there's no treble provision here, but punitive damages serve a similar punitive purpose. Plaintiff also seeks attorney's fees pursuant to 42 U.S.C. § 1988 for this claim, as § 1985 is one of the statutes covered by the civil rights fee-shifting provisions (conspiracies to violate constitutional rights are within the ambit of § 1988(b)). We ask the Court to award all such damages and fees as prove appropriate.

35. Equitable Relief under § 1985(3): In addition to monetary relief, Plaintiff under Count I seeks equitable remedies. The statute itself doesn't forbid equitable relief, and federal courts have broad power to enjoin violations of federal law. Here, an injunction is appropriate to disband the conspiracy (though the conspirators aren't formal group, an injunction can still run against Defendant's future coordinated harassment with others). This overlaps with the injunctive relief request below, but to be clear: Plaintiff seeks an injunction prohibiting Defendant from conspiring or acting in concert with others to harass or harm Plaintiff on the basis of his protected traits, and requiring Defendant to take down any remaining social media posts or messages within her control that were part of the conspiracy (like defamatory or threatening messages). The continuing threat of irreparable harm – fear for Plaintiff's safety and mental well-being – justifies injunctive relief on top of damages.

36. Conclusion on § 1985(3): All prerequisites for a § 1985(3) claim are met. Plaintiff has more than a "parallel conduct and bare assertion" – he has detailed specific facts of agreement and animus . Therefore, Defendant is liable under § 1985(3) for the conspiracy

and all resultant harm.

## Count II – Deprivation of Civil Rights Under Color of State Law (42 U.S.C. § 1983 – Equal Protection, etc.)

37. Section 1983 Liability: Plaintiff incorporates all prior allegations. 42 U.S.C. § 1983 provides a cause of action against any person who, under color of any statute, ordinance, regulation, custom, or usage, of any State, subjects, or causes to be subjected, any citizen of the United States to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws. Here, Defendant Moreno is such a person who, acting under color of state law (as discussed in Paragraph 11 and further below), subjected Plaintiff to the deprivation of rights secured by the Constitution – specifically:

- The right to Equal Protection of the laws (Fourteenth Amendment) – freedom from discrimination based on race, ethnicity, or sex (including sexual orientation as a subset of sex discrimination, per interpretations post-Bostock v. Clayton County, 140 S. Ct. 1731 (2020), and equal protection jurisprudence).

- The right to freedom from unreasonable interference in person and property (Substantive Due Process – to the extent the harassment infringed a fundamental interest in personal security and bodily integrity).

- The right to freedom of expression and to petition (First Amendment), to the extent Defendant retaliated against Plaintiff's protected speech (complaining about discrimination).

   These constitutional rights are "secured by the Constitution," satisfying § 1983's requirement.

38. Under Color of State Law: Although Defendant is not a formal state official, her actions are deemed under color of state law due to:

- Joint Participation with State Actors: On information and belief, at certain points Defendant acted in concert with or with the encouragement or acquiescence of state actors (school personnel). For example, if discovery shows any school staff were aware of Defendant's conduct and tacitly allowed it (perhaps a coach ignoring why Plaintiff was bullied off the team, or teachers who heard slurs and did nothing), those could constitute a "custom or usage" of the state (tolerating harassment) that Defendant leveraged to harm Plaintiff. A private person who conspires with an official or who is delegated some authority (like team captain or club leader authority implicitly granted by coaches/teachers) can be a state actor. If Defendant held any position like club officer or if a teacher gave her leeway to discipline or exclude, that's direct color of law. Even absent a formal role, the joint action test can be met if there's evidence the school resource officer, for instance, was aware of threats and chose not to intervene due to bias – effectively aiding Defendant. At this stage, Plaintiff alleges that such joint engagement

will be borne out – at minimum, the school's anti-bullying policy was not enforced, which could indicate a meeting of minds between Defendant and school agents (perhaps due to some biases shared, or just negligence – though negligence alone doesn't suffice for § 1983, but repeated tolerance might).

- Symbiotic Relationship/Nexus: The harassment largely occurred on school property during school time. There's a strong nexus between Defendant's conduct and the state's provision of education. The state provided the forum (classrooms, teams, etc.) and Defendant's conduct was "enabled" by that forum. In a West v. Atkins, 487 U.S. 42 (1988) sense, performing a function in a state setting can be under color if the function is traditionally exclusive to the state. Maintaining discipline and student welfare is an exclusive state function in schools. Defendant effectively usurped that function by imposing her own biased discipline (i.e., punishing Plaintiff for being who he is through bullying). The state, through its public school, has a duty to protect students; when it fails and a private actor fills that void with abuse, an argument can be made that the private actor was exercising a governmental function (though this is a novel application, Plaintiff asserts it in good faith).

- Conspiracy with State Actor Theory: As pleaded in Count I, if any member of the conspiracy was a state actor (for instance, if a teacher or coach subtly encouraged the ostracism – perhaps by making a homophobic comment themselves or ignoring rules to let it happen), then under Dennis v. Sparks, all conspirators (including Defendant) acted under color of law . Plaintiff will seek evidence in discovery if any school official was

part of the problem (even if not maliciously, maybe through tacit agreement). One possible angle: Plaintiff's parent had at one point emailed the school about name-calling; the response was lukewarm, effectively giving the green light to bullies – that could be seen as an official policy of inaction, aligning the school with Defendant's conduct. If proven, Defendant's actions post-that are fairly attributable to the state's custom.

- Public Function Test: Public education is a public function. Private entities can sometimes perform that (e.g., a private school could be state actor if mandated), but here a private individual carrying out what amounts to discriminatory discipline might be analogized to someone enforcing an unwritten Jim Crow at a school. Historically, if a white citizen's council policed segregation with tacit state approval, courts might find state action. Analogously, Defendant's clique enforced a discriminatory order within the school environment; if the school effectively allowed them to do so, that's state action.

In sum, Plaintiff acknowledges this is a grey area, but asserts under Lugar v. Edmondson Oil Co., 457 U.S. 922 (1982), that Defendant's conduct is "fairly attributable" to the state given the context and cooperation involved. At the very least, it's a mixed question that should survive pleading to allow discovery on school involvement. Therefore, Defendant acted under color of Virginia law in subjecting Plaintiff to the deprivations.

39. Specific Constitutional Violations:

- Equal Protection Clause: Defendant intentionally discriminated against Plaintiff on the basis of sexual orientation and race/national origin, depriving him of equal protection. In a public school context, even a private actor could be liable if clothed with state authority, but focusing on the right – Plaintiff was denied equal protection of the laws because he did not receive the same protection from harassment and the same opportunity to participate as a heterosexual or non-North African student would. The animus-based disparate treatment is a straightforward Equal Protection violation (were Defendant a teacher, this would clearly violate EP; as a private actor collaborating with others, we extend that liability to her).

- The Supreme Court has held that intentional discrimination by anyone with state authority triggers Equal Protection scrutiny. Sexual orientation discrimination triggers at least intermediate scrutiny (if seen as sex discrimination or as a quasi-suspect class in some circuits) or rational basis with bite – and nothing about Defendant's actions serves any legitimate purpose, failing even rational basis. Racial/ethnic discrimination is subject to strict scrutiny, which this fails by far. Thus, Plaintiff's equal protection rights were violated.

- First Amendment (Retaliation): Plaintiff engaged in protected expression by objecting to harassment and indicating he might seek legal redress. Defendant's subsequent adverse actions (like increased harassment, threats, and attempts to ostracize him further, plus likely disparaging him for complaining) constitute retaliation that would deter a person of ordinary firmness from speaking again. If Defendant is deemed a state actor for these

purposes (by joint activity), that's a First Amendment retaliation claim. It's well established one cannot retaliate for someone's complaints of discrimination (that's a violation under First Amendment and also Title VI/IX analogies). The timing and content (Defendant's hostile response to "formal notice" text) show a causal link between Plaintiff's protected activity and the retaliation.

- Due Process (Substantive): All persons have a constitutional right to bodily integrity and to personal security. While usually due process claims for peer harassment are against school officials for deliberate indifference (and often fail absent special relationship or state-created danger), here we frame it differently: Defendant, acting with state tolerance (state-created danger theory: the school's lax response created an environment where Defendant could harm Plaintiff), deprived him of his liberty interest in personal security. For instance, cornering and threatening someone implicates their liberty. If state authority was involved in creating the danger or failing to stop it, § 1983 can apply (some circuits allow a state-created danger claim if officials knew of danger and did nothing; here the direct defendant is the bully, not officials, but conceptually we tie her behavior to state-created danger). Alternatively, consider that education is sometimes considered a property right under state law – depriving someone of equal educational access by intimidation might implicate procedural due process if done by someone effectively performing a state function (though here no process issue, it's substantive discrimination).

- These constitutional hooks illustrate that Plaintiff's § 1983 claim is grounded in core rights.

40. Causation: Defendant's actions, under color of law, caused the deprivation of Plaintiff's rights. But for Defendant's campaign, Plaintiff would not have been deprived of equal protection or expressive rights in the manner he was. Her conduct was a substantial factor in the injuries. The language of § 1983 requires the defendant to "subject or cause to be subjected" the plaintiff to the rights deprivation – which is satisfied here. Even if state actors were also negligent, Defendant's role is not absolved; she directly inflicted harm and participated in the causation chain.

41. No Justification: There is no legitimate governmental interest or legal justification for Defendant's actions. Harassing a student for being gay or North African serves no valid purpose and violates clearly established rights. If Defendant tries to argue some sort of personal free speech right to use slurs, that fails because (a) as a state actor, she'd be bound by Equal Protection not to discriminate, and (b) even private, free speech does not immunize conduct that targets an individual for harm (especially under conspiracy or harassment law). In any event, once we are under color of law, she cannot hide behind the First Amendment to excuse what is effectively discriminatory conduct, not merely speech.

42. Damages under § 1983: Plaintiff has suffered damages as described. Under § 1983, he is entitled to compensatory damages for the violations of his constitutional rights (including

emotional distress, personal humiliation, and any economic losses flowing from the deprivation of rights). He is also entitled to punitive damages because Defendant's conduct was malicious or showed reckless indifference to Plaintiff's federally protected rights (per Smith v. Wade). The same facts establishing malice for defamation and IIED demonstrate it here: for instance, continuing to harass someone knowing it violates their rights is the epitome of reckless disregard for those rights. Additionally, Plaintiff seeks nominal damages to vindicate the constitutional rights (even if actual damages were minimal, which they are not, nominal damages of $1 are appropriate to mark that a rights violation occurred). But here actual damages are significant.

43. Attorney's Fees: As this count arises under § 1983, Plaintiff requests attorney's fees and expenses under 42 U.S.C. § 1988(b) should he prevail. Defendant's actions forced Plaintiff to seek legal help to stop the violation of fundamental rights, exactly the scenario Congress intended fee shifting to cover to encourage enforcement of civil rights.

44. Injunctive/Declaratory Relief: Plaintiff seeks a declaratory judgment that Defendant's conduct violated his rights under the Constitution and laws (42 U.S.C. §§ 1983, 1985). Such declaratory relief will serve a useful purpose in clarifying the legal relationship and hopefully deterring Defendant from claiming any entitlement to resume such conduct. Plaintiff also seeks injunctive relief on this count (overlapping with what was described under Count I and in prayer) – specifically, an injunction requiring Defendant to cease any harassment or discrimination against Plaintiff, and prohibiting her from retaliating against Plaintiff for bringing this lawsuit (which is protected activity under the First

Amendment, so any retaliation would itself violate § 1983 as a continuing wrong). The injunction should further compel Defendant to remove any remaining defamatory or threatening postings about Plaintiff if not already removed. Since § 1983 allows equitable relief and there is a real threat of continuing harm (Defendant has not acknowledged wrongdoing and remains in the same community as Plaintiff), such relief is warranted.

45. Conclusion on § 1983: By acting in concert with others and exploiting the state's apparatus to harm Plaintiff due to his protected characteristics, Defendant Moreno violated 42 U.S.C. § 1983. She is liable for all resulting damages and subject to the equitable power of this Court to prevent future violations.

# Prayer for Relief

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and grant the following relief:

1. Declaratory Relief: A declaratory judgment pursuant to 28 U.S.C. §§ 2201–2202 declaring that Defendant Nayelli Moreno's actions as described herein violated Plaintiff's rights under the Constitution and laws of the United States, in that Defendant conspired to deprive Plaintiff of equal protection of the laws in violation of 42 U.S.C. § 1985(3) and acted under color of state law to subject Plaintiff to deprivations of equal protection (and related rights) in violation of 42 U.S.C. § 1983. (Such declaration will make clear that Defendant's conduct was unlawful and without justification.)

2. Injunctive Relief: A permanent injunction prohibiting Defendant, her agents, and all persons in active concert or participation with her from engaging in any further harassment, threats, or discriminatory or retaliatory actions against Plaintiff based on his sexual orientation, ethnicity, or any other protected characteristic. This injunction should include but not be limited to:

- No Contact/Harassment: Barring Defendant from contacting Plaintiff (whether in person, through third parties, or electronically) in any harassing or intimidating manner, and ordering her to stay a reasonable distance away from Plaintiff's residence, school (if they were still in school together), or workplace, to ensure his safety and peace.

- No Online Harassment: Barring Defendant from publishing or causing to be published any defamatory or threatening statements about Plaintiff on social media or elsewhere. If any such statements/posts remain, Defendant is ordered to delete or retract them.

- No Retaliation: Prohibiting Defendant from retaliating against Plaintiff for pursuing this lawsuit or otherwise exercising his rights. This includes any form of retaliation like spreading new rumors, encouraging others to shun or harm him, or filing baseless actions against him.

- The Court's injunction should be tailored to ensure Plaintiff can live free from the fear that gave rise to this action. Given that the parties reside in the same community, such injunctive relief is necessary to supplement monetary relief.

3. Compensatory Damages: An award of compensatory damages against Defendant to compensate Plaintiff for all injuries suffered as a result of Defendant's unlawful conduct. This includes damages for:

- Past and future emotional pain, suffering, and mental anguish;

- Loss of enjoyment of life and humiliation;

- Harm to reputation and standing in the community;

- Out-of-pocket expenses related to medical or psychological treatment and other costs incurred to mitigate the harm;

- Loss of educational or career opportunities or other economic harm (if any evidence at trial shows, e.g., Plaintiff had to alter educational plans due to the harassment).

Plaintiff suggests that the evidence will warrant a significant compensatory award, and while a specific dollar figure is left to the jury, Plaintiff believes that an award in excess of $1,000,000 is appropriate given the severity and duration of the deprivation of rights and personal injuries suffered.

4. Punitive Damages: An award of punitive damages against Defendant under both federal claims, to punish her for her willful, malicious, and reckless disregard of Plaintiff's rights, and to

deter her and others from similar conduct. Plaintiff notes that punitive damages are available under § 1983 (and by extension, via § 1988, for § 1985 violations as well) where a defendant's conduct is motivated by evil intent or reckless indifference . Here, Defendant's conduct meets that standard — it was egregious hate-based misconduct. Plaintiff requests that the jury be permitted to award punitive damages commensurate with Defendant's financial resources and the need for deterrence. Without specifying an exact amount (to be determined by the jury), Plaintiff believes punitive damages on the order of $200,000 or more may be necessary to send an appropriate message, subject to constitutional limits and the evidence of Defendant's net worth.

5. Nominal Damages: Should the trier of fact find that Plaintiff's actual compensatory damages are minimal or should it be necessary to vindicate the principle that Defendant violated Plaintiff's rights even if no substantial injury is found, Plaintiff seeks nominal damages (typically $1) on each federal claim. (This is pleaded in the alternative to ensure that even in absence of large compensatory findings, a judgment for Plaintiff will reflect the wrongfulness of Defendant's actions.)

6. Attorneys' Fees and Costs: An award of Plaintiff's reasonable attorneys' fees and expenses, and costs of this action, pursuant to 42 U.S.C. § 1988(b) (which authorizes fee awards to prevailing parties in actions under § 1983 and § 1985) . Given the willful nature of Defendant's violations, fee-shifting is appropriate so that Plaintiff is fully made whole and not burdened by the cost of enforcing his civil rights. Plaintiff will submit a fee petition detailing the hours and rates, to be approved by the Court, should he prevail.

7. Pre- and Post-Judgment Interest: An award of prejudgment interest on all monetary damages, from the date of Plaintiff's injuries (or a date deemed appropriate by the Court) until the date of

judgment, as well as post-judgment interest at the legal rate from the date of judgment until paid, pursuant to 28 U.S.C. § 1961. This is to ensure full compensation given the time value of money and to disincentivize delay in payment.

8. Any Other Relief: Any further relief that this Court deems just and proper, including but not limited to equitable relief such as court-ordered monitoring or reporting to ensure Defendant's compliance with the injunction (for example, requiring Defendant to report any incidental contact or future residence changes for a period, or ordering her to complete an anti-discrimination educational program). The Court's broad equitable powers may be used to craft appropriate relief to ensure Plaintiff's protections and Defendant's rehabilitation, if possible.

Plaintiff demands a trial by jury on all issues triable by a jury.

---

Sources: The factual allegations are supported by exhibits including screenshots of Defendant's communications (e.g., Defendant saying "bro a fag…" in a group chat) and Plaintiff's reports of the harassment ("they all hated me cuz I was gay"). Legal contentions are supported by relevant case law and statutes, such as the definition of defamation , the elements of IIED under Virginia law , Virginia's conspiracy statute , and federal civil rights precedents confirming that private conspiracies with class-based animus are actionable and setting forth the elements of a § 1985(3) claim . These authorities and evidence pieces have been cited throughout this Complaint to demonstrate the strength of Plaintiff's claims and to ensure the Complaint is robust against any motion to dismiss or demurrer.

# SECTION 5: Astrid Denbo

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF VIRGINIA

Richmond Division

SAMIR ALMUDHAFER,

   Plaintiff, pro se,

v.                                    Civil Action No.: _____

ASTRID DENBO,

   Defendant.

COMPLAINT (AS TO DEFENDANT ASTRID DENBO ONLY)

(JURY DEMAND)

Plaintiff Samir Almudhafer ("Plaintiff"), pro se, alleges as follows as to Defendant Astrid Denbo ("Denbo"):

-----------------------------------------------------------

I. JURISDICTION, VENUE, AND JOINDER

-----------------------------------------------------------

1. This Court has subject-matter jurisdiction over the action as a whole pursuant to 28 U.S.C. § 1331 because Plaintiff's operative complaint asserts claims arising under federal law against other defendants (set forth in other sections of the pleading).

2. Defendant Denbo is properly joined under Fed. R. Civ. P. 20 because the claims against Denbo arise from the same nucleus/series of occurrences within the school-community facts and share common questions including coordination, escalation, and the foreseeability of threats and intimidation.

3. This Court has supplemental jurisdiction over Plaintiff's Virginia claims against Denbo pursuant to 28 U.S.C. § 1367 because they form part of the same case or controversy.

4. Venue is proper in this District because a substantial part of the events and resulting harm occurred within the District and/or because Denbo resides in Virginia.

\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-

## II. PARTIES

\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-

5. Plaintiff is a resident of Spotsylvania County, Virginia.

6. Defendant Denbo is a resident of Virginia and, on information and belief, was a student or peer in the Spotsylvania school-community environment at the relevant times.

\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-

## III. LIMITATIONS AND TOLLING (INFANCY)

\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-

7. Plaintiff was a minor during much of the conduct alleged herein.

8. Under Virginia tolling principles applicable to the incorporated state-law claims, limitations are tolled during infancy, and Plaintiff reached majority on January 25, 2025.

9. Plaintiff pleads timely filing after tolling, including for any defamation/insulting-words claims.

--------------------------------------------------------------

IV. FACTUAL ALLEGATIONS (DENBO)

--------------------------------------------------------------

A. Doxxing and violence-justification publication

10. On or about [DATE], Denbo published an Instagram story (or materially similar post) containing Plaintiff's personal phone number.

11. Denbo paired the phone-number publication with the statement: "that's why you got stabbed."

12. This was published to an audience of peers within the school-community environment.

13. Denbo's publication communicated that violence against Plaintiff was deserved or justified and invited hostility against Plaintiff.

14. The doxxing created an obvious and foreseeable risk of harassment and threatened violence against Plaintiff.

B. Threatened violence

15. Denbo escalated with threatened violence, including the statement: "and we wont have to scrap ." (sic).

16. In the context of student communications, "scrap" is a fighting term that communicates physical confrontation.

17. Denbo's threat was understood by Plaintiff as a credible threat in a context where in-person confrontation was plausibly imminent.

C. Reputational attack to justify mistreatment

18. Denbo further attacked Plaintiff's character with statements including: "im not arguing with a lying and manipulative bitch" (sic).

19. In the context of doxxing and threats, Denbo's reputational attacks served to justify hostility toward Plaintiff and to silence or delegitimize Plaintiff.

D. Procurement / instigation of third-party threats (information and belief)

20. On information and belief, Denbo caused, encouraged, prompted, or procured one or more third parties to threaten Plaintiff during Plaintiff's sophomore year as part of the same campaign of intimidation.

21. Plaintiff will identify involved persons, accounts, communications, and timestamps through discovery.

E. Harm

22. Denbo's conduct caused Plaintiff fear for personal safety, loss of privacy, reputational injury, and severe emotional distress.

-----------------------------------------------------------

V. FEDERAL CLAIMS (DENBO) (PLED IN THE ALTERNATIVE)

-----------------------------------------------------------

COUNT I – 42 U.S.C. § 1985(3): CONSPIRACY TO DEPRIVE CIVIL RIGHTS (Private Conspiracy – Alternative)

23. Plaintiff incorporates Paragraphs 1–22.

24. Denbo conspired with others to subject Plaintiff to intimidation, threats, and harassment, and to deprive Plaintiff of equal protection of the laws.

25. Acts in furtherance included doxxing Plaintiff's phone number, publishing "that's why you got stabbed," threatening violence ("scrap"), and on information and belief procuring or facilitating third-party threats.

26. Plaintiff suffered injury including fear for safety, reputational harm, and emotional distress.

27. Plaintiff pleads the class-based animus element to the extent supported by evidence, including animus based on Plaintiff's [sexual orientation] and/or [ethnicity/national origin] and/or [gender nonconformity], and reserves the right to further particularize upon discovery.

28. This count is pled in the alternative, recognizing that private § 1985(3) claims are scrutinized and require specific proof of agreement, discriminatory animus, and a cognizable protected-right interference.

COUNT II – 42 U.S.C. § 1986: NEGLECT TO PREVENT (Derivative – Alternative)

29. Plaintiff incorporates Paragraphs 1–28.

30. To the extent Denbo had knowledge of a § 1985(3) conspiracy and had the power to prevent or aid in preventing the wrongs but neglected or refused to do so, Denbo is liable under § 1986.

31. Plaintiff suffered damages.

\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-

## VI. SUPPLEMENTAL VIRGINIA CLAIMS (DENBO)

\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-

## COUNT III – ASSAULT (Virginia Common Law)

32. Plaintiff incorporates Paragraphs 1–22.

33. Denbo intentionally threatened physical confrontation, including: "and we wont have to scrap ."

34. Plaintiff reasonably apprehended imminent harmful contact in the school-community context.

35. Plaintiff suffered damages.

## COUNT IV – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (Virginia)

36. Plaintiff incorporates Paragraphs 1–22.

37. Denbo's conduct was extreme and outrageous, including doxxing Plaintiff's phone number, pairing it with a stabbing-justification statement, and issuing violence threats.

38. Denbo intended to cause emotional distress or acted with reckless disregard.

39. Plaintiff suffered severe emotional distress and damages.

## COUNT V – DEFAMATION (LIBEL) (including implication/innuendo)

40. Plaintiff incorporates Paragraphs 1–22.

41. Denbo published "that's why you got stabbed" concerning Plaintiff, in a context implying factual blameworthiness and deserved violence.

42. The statement was published to third parties and tended to harm Plaintiff's reputation and expose him to contempt and hostility.

43. Denbo acted with the requisite intent, at minimum negligence and in fact malice.

44. Plaintiff suffered damages.

## COUNT VI – INSULTING WORDS (Va. Code § 8.01-45)

45. Plaintiff incorporates Paragraphs 1–22.

46. Denbo published insulting words which tend to violence and breach of the peace, including the stabbing-justification statement and threat context.

47. Plaintiff suffered damages.

COUNT VII – CIVIL ACTION FOR STALKING (Va. Code § 8.01-42.3) (Alternative)

48. Plaintiff incorporates Paragraphs 1–22.

49. Denbo engaged in a course of conduct on more than one occasion that placed Plaintiff in reasonable fear of bodily injury, including doxxing + violence-justification + threats.

50. Plaintiff suffered compensatory damages, and punitive damages are warranted.

COUNT VIII – BIAS-MOTIVATED INTIMIDATION / HARASSMENT (Va. Code § 8.01-42.1) (Plead only if you can truthfully allege motive)

51. Plaintiff incorporates Paragraphs 1–22.

52. Denbo subjected Plaintiff to intimidation/harassment and threatened violence motivated by protected animus, including [sexual orientation] and/or [ethnic/national origin] [as supported by evidence].

53. Plaintiff is entitled to damages and injunctive relief.

COUNT IX – COMMON-LAW CIVIL CONSPIRACY (Virginia) (Alternative)

54. Plaintiff incorporates Paragraphs 1–22.

55. Denbo conspired with one or more persons to intimidate Plaintiff and harm Plaintiff through unlawful means, including threats and harassment.

56. Plaintiff suffered damages proximately caused by the conspiracy.

COUNT X – INJUNCTIVE RELIEF (Equitable)

57. Plaintiff incorporates Paragraphs 1–22.

58. Denbo published Plaintiff's private phone number and encouraged hostility and threatened violence.

59. Plaintiff seeks injunctive relief requiring removal and prohibiting republication and facilitation of harassment/threats.

------------------------------------------------------------

VII. PRAYER FOR RELIEF

------------------------------------------------------------

WHEREFORE, Plaintiff requests judgment against Defendant Denbo as follows:

A. Compensatory damages in $1,000,000 and/or an amount to be proven at trial;

B. Punitive damages to punish willful and malicious conduct;

C. Injunctive relief requiring removal of posts containing Plaintiff's phone number and prohibiting further publication or encouragement of harassment/threats;

D. Costs of suit and such other relief as permitted by law;

E. Pre- and post-judgment interest as allowed; and

F. Trial by jury on all triable issues.

------------------------------------------------------------

VIII. JURY DEMAND

------------------------------------------------------------

Plaintiff demands trial by jury.

# SECTION 6: Ruben Navarro

**(FEDERAL CIVIL RIGHTS + SUPPLEMENTAL VIRGINIA TORT CLAIMS)**

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

RICHMOND DIVISION

Samir Almudhafer, Plaintiff,

v.

Ruben Navarro, Defendant.

Civil Action No.: _____

# COMPLAINT

## I. JURISDICTION AND VENUE

1.  This Court has jurisdiction under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343(a) (civil rights jurisdiction).

2.  Plaintiff brings claims under 42 U.S.C. §§ 1985 and 1986.

3. The Court has supplemental jurisdiction over the Virginia tort claims under 28 U.S.C. § 1367 because they form part of the same case or controversy.

4. Venue is proper under 28 U.S.C. § 1391 because a substantial part of the events occurred in this District, and division is proper in the Richmond Division.

## II. PARTIES

5. Plaintiff Samir Almudhafer is a natural person and citizen of Virginia.

6. Defendant Ruben Navarro is a natural person and, on information and belief, a citizen of Virginia.

## III. LIMITATIONS AND TOLLING

7. Plaintiff pleads tolling based on infancy to the extent any claim accrued while Plaintiff was a minor. Virginia tolling law provides that limitations are tolled during infancy.

8. Plaintiff reached the age of majority on January 25, 2025.

9.  Plaintiff further pleads the one-year federal limitations period applicable to § 1986 and pleads tolling/equitable tolling as supported by law and facts.

## IV. FACTUAL ALLEGATIONS

A. The "obsessed/stalker" narrative and third-party smear

10. On or about December 2022, Defendant initiated and/or escalated a line of accusation portraying Plaintiff as "obsessed," a "fan," and someone who cannot stop watching Defendant, including:

a. "ur legit a fan … always have my name in ur mouth …".

b. "u got a staring prblm too bro cant keep his eyes off me".

c. Defendant repeatedly insisted Plaintiff "came for" him first and accused Plaintiff of "back tracking," attempting to cast Plaintiff as the aggressor while preserving Defendant's smear narrative.

11. On or about December 2022, Defendant expressly tied this narrative to an accusation about Plaintiff taking pictures of Defendant's home, stating words to the effect of:

"i called u out on being weird for taking a picture of my house …".

12. On information and belief, Defendant did not confine these accusations to private messages. Defendant republished and/or caused the publication of the "weird / taking pictures / obsessed" narrative to third parties in the school community, with the foreseeable effect of harming Plaintiff's standing and safety.

B. Targeting Plaintiff's sexuality as a weapon

13. Defendant injected Plaintiff's sexuality into the dispute and sought to minimize it with a semantic dodge:

"didnt call u a fag i said u were gay ...".

The statement is an admission that Defendant was raising Plaintiff's sexual orientation as part of an attack and social targeting campaign.

C. Disability/neurological slur

14. Defendant used disability-based slurs against Plaintiff, including:

"mad autistic".

Defendant did not use that phrase medically; he used it as degradation and social stigma.

D. Degrading personal attacks (malice, pattern, punitive-damages facts)

15. Defendant repeatedly attacked Plaintiff's physical appearance and body in graphic, humiliating language, including but not limited to:

a. "ur face look dumb".

b. "deformed ass face" and "weird bottom jaw".

c. "ugly," "dummy," "stfu," and similar directives intended to intimidate and demean.

d. "close ur mouth when ur breathing buddy"

e. "not an ounce of muscle on ur frame"

16. Defendant also targeted Plaintiff in relation to athletics and social standing, stating words to the effect of Plaintiff "look[ing] funny on the field" (Ex. __), reinforcing a pattern of humiliation intended to harm Plaintiff's reputation among peers.

E. Defendant's conduct was intentional, reckless, and designed to cause distress

17. The repeated nature, slur usage, and "obsessed/stalker" insinuations show purpose: to brand Plaintiff as socially unacceptable and to provoke emotional harm.

- Plaintiff suffered severe emotional distress, fear of social and physical escalation at school, reputational injury, and disruption to daily functioning.

## V. CAUSES OF ACTION (FEDERAL)

# COUNT I – 42 U.S.C. § 1985(3) (CONSPIRACY TO DEPRIVE CIVIL RIGHTS)

10. Plaintiff incorporates prior paragraphs.

11. Plaintiff alleges, on information and belief, that Defendant conspired with one or more persons to injure Plaintiff and to subject him to unequal protection of the laws through a targeted campaign of stigmatization and reputational harm aimed at Plaintiff's perceived sexual orientation and disability status, including the "obsessed/stalker" narrative and slur-based harassment.

12. Defendant committed overt acts in furtherance of the conspiracy, including the quoted conduct and republication activity.

13. Plaintiff suffered injury as a result.

# COUNT II – 42 U.S.C. § 1986 (NEGLECT TO PREVENT)

14. Plaintiff incorporates prior paragraphs.

15. Defendant had knowledge of the § 1985 conspiracy and the power to prevent or aid in preventing the wrongs, but neglected or refused to do so, resulting in injury.

## VI. SUPPLEMENTAL VIRGINIA CLAIMS (28 U.S.C. § 1367)

(Then plead the same state counts as in the Circuit Court filing, incorporated here as supplemental claims:)

- Defamation

- Defamation per se (as applicable)

- Insulting Words (Va. Code § 8.01-45)

- IIED (Womack/Russo framework; strict threshold)

- Common-law conspiracy

- Statutory conspiracy (Va. Code §§ 18.2-499/500) with treble damages/fees/injunction

## VII. PRAYER FOR RELIEF

Plaintiff requests:

A. Compensatory damages;

B. Punitive damages where available;

C. Treble damages/fees where authorized under Virginia statutory conspiracy;

D. Injunctive relief;

E. Costs;

F. Such other relief as the Court deems proper.

## VIII. JURY DEMAND

Plaintiff demands a jury trial.

Respectfully submitted,

Samir Almudhafer (pro se)

9613 Hazelbrook Ct. Fredericksburg VA, 22407

(540) 455-7695

pharaoh.samir7@gmail.com

12/31/2025